Charles D. Vantress and Jane F. Vantress v. Commissioner.
Vantress v. Commissioner
Docket No. 93720.
United States Tax Court
T.C. Memo 1964-123; 1964 Tax Ct. Memo LEXIS 212; 23 T.C.M. (CCH) 711; T.C.M. (RIA) 64123; May 4, 1964
*212 Petitioner received stock in the amount of $525,000 and five debenture bonds in the total face amount of $500,000 in 1954 when he incorporated his sole proprietorship and transferred all his operating assets to the corporation. The debenture bonds in form were evidences of indebtedness. In 1956 petitioner sold the debenture bonds to an investment brokerage firm for face value plus accrued interest of $7,916.67. Six months later the corporation redeemed said bonds for face amount plus $26,000 of accrued interest. Held: That the debenture bonds are bona fide evidences of indebtedness, and, held further, that no part of the interest in the amount of $26,000, received by the brokerage firm is income to petitioner. Earle B. May, Jr., and Edward R. Kane, Haas-Howell Bldg., Atlanta, Ga., for the petitioners. *213 George W. Calvert, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax of petitioners in the amount of $331,591.61 for 1956. The only issue to be determined is whether or not petitioners received ordinary income (dividends) in the amount of $526,000 for 1956 on the sale and redemption of 6 percent debenture bonds of Chas. Vantress Farms, Inc. Findings of Fact The stipulated facts are found accordingly and the stipulation, together with the exhibits identified, are included herein by reference. Petitioners are husband and wife residing at 3140 West Andrews Drive, N.W., Atlanta, Georgia. They filed their joint Federal income tax return for 1956 with the district of Georgia, Atlanta, Georgia. Since Jane F. Vantress is a party to this proceeding only because she filed a joint income tax return for the year 1956, Charles D. Vantress will hereinafter be referred to as petitioner. Prior to February 28, 1954, petitioner, a practicing geneticist, was a member of a family partnership known as Vantress Hatchery, located in Marysville, California. The other members of the partnership, which *214 was engaged in the poultry business, were petitioner's two brothers and his mother. The partnership was made up of two separate businesses. One business was the Vantress Hatchery which was a commercial hatchery engaged in the business of selling baby chicks. The other division of the business was the Vantress Poultry Breeding Farm which was engaged in breeding, developing, and selling chickens for breeding stock. Petitioner was in charge of this latter division of the partnership. Since 1938 petitioner has been engaged in the business of pedigree breeding and selling a new type of chicken, known as the Vantress male line, which is used for breeding purposes by the meat chicken industry. By using meat chickens sired by the Vantress male line, the meat chicken industry since 1949 has lowered its cost of production of meat chickens, and has increased the value of its meat chickens sold. This results from the fact that meat chickens sired by the Vantress male line have many qualities which make them superior to ordinary meat chickens. In 1948 meat chickens sired by the Vantress male won first place by a substantial margin in a national Chicken of Tomorrow contest conducted by A *215 & P Food Stores, the United States Department of Agriculture, and others interested in the meat chicken business. Meat chickens sired by the Vantress male also won first place by an even bigger margin in a similar Chicken of Tomorrow contest held in 1951. The winning of such contests brought the Vantress male to the attention of the entire meat chicken industry. During the period from 1949 through 1953 sales and earnings from the business of breeding and selling the Vantress male chickens were increasing rapidly. In 1949 approximately 5 percent of meat chickens grown in the United States were sired by the Vantress male; in 1953 approximately 20 percent meat chickens grown in this country were sired by the Vantress male; and by 1957 the percentage had risen to approximately 80 percent. In 1949 the earnings from breeding and selling the Vantress male were about $24,000 and for 1953 the earnings from such business were approximately $115,000. The partnership (Vantress Hatchery) was dissolved in February 1954. On dissolution petitioner received the entire ownership of the Vantress male, the genealogical breeding records thereof, the breeding flocks used in producing the Vantress male *216 and the egg inventory. Petitioner also received the right to sell Vantress male breeding stock in all of the United States except seven western states. The right to sell in the latter states was obtained in March 1957. In addition, he received 20 percent of the depreciated book value of the assets of the partnership. The net earnings of the Vantress Hatchery in 1949 to the date of its dissolution in 1954 are as follows: Year
Amount
1949
$254,026.90
1950
442,670.10
1951
387,778.85
1952
321,174.35
1953
383,117.18
1-1-54 to 2-28-54
109,557.27
In 1954 petitioner moved his main business of operations from California to Georgia. He located in the Duluth area, near Gainsville, and conducted the development, breeding, and sale of the Vantress male chicken as a sole proprietorship. In connection with his operation of developing, breeding, and selling the Vantress male chicken, petitioner acquired land, built the necessary buildings, and purchased the necessary equipment. He also needed an office, pedigree pens, production houses, incubators and related equipment. In addition to the pedigree Vantress male chickens (which were the production flocks) an inventory *217 of eggs of said line, and the pedigree records thereof, he required a substantial amount of cash. The breeding, development, and sale of the Vantress male could not be carried on without the breeding records, breeding flocks, and the egg inventory. In 1954 petitioner commenced to convert his sole proprietorship into a corporation. He caused Chas. Vantress Farms, Inc., (hereinafter sometimes referred to as Farms, Inc.) to be incorporated under the laws of the State of Georgia on September 24, 1954. Its authorized capital stock at the date of incorporation was $725,000, consisting of 4,000 shares of common stock with a par value of $100 per share, and 3,250 shares of noncumulative 4 percent preferred stock, par value $100, having no voting rights. The charter was amended on September 1, 1955, to increase the maximum authorized capital stock to $755,000 consisting of 4,000 shares of common stock with a par value of $100 per share, 3,250 shares of noncumulative 4 percent preferred stock without voting rights, with a par value of $100 per share, and 300 shares of Class "A" cumulative redeemable 5 percent preferred stock with voting rights, with a par value of $100. On or about October 1, 1954, Farms, *218 Inc., issued to petitioner 2,000 shares of its common stock and 3,250 shares of its 4 percent noncumulative preferred stock having a total par value of $525,000. In addition, the corporation issued to petitioner 6 percent debenture bonds (hereinafter sometimes referred to as bonds) with face amounts totaling $500,000. There wwre 5 such bonds, each in the amount of $100,000. The bonds read as follows: NUMBER
DOLLARS
1
$100,000.00
GEORGIA
GWINNETT COUNTY
CHAS. VANTRESS FARMS, INC. 6% DEBENTURE Chas. Vantress Farms, Inc., a corporation duly incorporated and existing under and by virtue of the laws of the State of Georgia, having its principal office in Gwinnett County, Georgia, does hereby promise and agree to pay to CHARLES D. VANTRESS or the registered assignee, the sum of One Hundred Thousand ($100,000.00) Dollars, good and lawful money of the United States, at the office of the corporation, on the date hereinafter stated, with interest from the 1st day of October, 1954, at the rate of six per cent (6%) per annum. Said interest shall be payable annually on the 1st day of October. This bond is one of a series of bonds in the aggregate face amount of *219 $500,000.00, consisting of five bonds numbered consecutively from 1 to 5, inclusive, each in the amount of $100,000.00, and the bonds of this series shall mature and become due and payable at the office of the corporation in the order of their numbering with one bond maturing each year on the 1st day of October beginning with the year 1967 and ending with the year 1971. This bond is transferable only on the books of Chas. Vantress Farms, Inc., upon surrender of the bond to the Treasurer of the corporation for transfer, and thereupon the date of transfer and the name of the registered assignee will be entered on the books of the corporation by the Treasurer and will be indicated on the certificate on the back thereof. Any or all of the bonds of this series may be redeemed after five (5) years from the date of issuance at face value and all accrued interest thereon. In the event of the exercise of this option by the corporation at any time, the particular bonds called for redemption shall be determined by lot, and notice of redemption shall be sent by mail to the registered holders of called bonds thirty days prior to the redemption date. The corporation reserves the right to issue *220 an additional Two Hundred Thousand ($200,000.00) Dollars in debentures while all or any part of this issue is still outstanding, such additional debentures to be on terms not more favorable than those of this issue. This debenture shall not be deemed to create any lien or charge against any specific property of the corporation. IN WITNESS WHEREOF, Chas. Vantress Farms, Inc., the obligor, has caused these presents to be signed in its corporate name by its President, and its corporate seal to be hereunto affixed, attested by its Secretary, in the County of Gwinnett, this 1st day of October, 1954. Attest: CHAS. VANTRESS FARMS, INC. /s/ Randolph W. Thrower Secretary BY (signed) Chas. Vantress President The five bonds represented the entire written agreement between petitioner and the corporation. There was no security or collateral agreement to protect the debenture bonds in addition to the bonds themselves. In exchange for the stock and bonds in the total face amount of $1,025,000 of Farms, Inc., petitioner on or about October 1, 1954, transferred to Farms, Inc., the following assets: (a) All pedigree records and breeding flocks pertaining to the Vantress male line. *221 (b) All inventory then on hand of eggs produced by the Vantress male line breeding flocks. (c) Cash, accounts receivable and other assets to be used in connection with the breeding, hatching, and sale of Vantress male line chickens. The income tax basis to petitioner of the assets that he transferred to Farms, Inc., in payment for the stock and bonds was $186,000. Petitioner treated his transfer of the assets to Farms, Inc., as a nontaxable exchange under section 351 of the Internal Revenue Code of 1954. The assets received by Farms, Inc., from petitioner were entered on the books of Farms, Inc., at a net valuation of $1,025,000, against which there was set up on the books of Farms, Inc., the following: 6 percent debenture bonds
$ 500,000
3,250 shares preferred stock
325,000
2,000 shares common stock
200,000
Total
$1,025,000
The bonds were at all times carried on the books, records and financial statements of Farms, Inc., as representing a debt owed by Farms, Inc., until they were redeemed and retired by the corporation. The bonds were at all times duly registered on the books of Farms, Inc. Of the assets having a value of *222 $1,025,000 transferred to Farms, Inc., the pedigree records and breeding flocks had a fair market value of $700,000 and the fair market value of the inventory of eggs was $125,000. In addition, petitioner transferred to the corporation other assets having a value of $200,000, consisting of cash in an amount between $50,000 and $100,000, accounts receivable, stock of four subsidiary corporations, and other assets to be used in connection with the breeding, hatching and sale of the Vantress male line chickens. These subsidiary corporations owned the buildings and land used by Farms, Inc., in its operations. At the time he transferred his business to Farms, Inc., petitioner believed the business to be on the verge of substantial financial success, since it was reasonably foreseeable that the demand for the Vantress male line would continue to increase rapidly and that Farms, Inc., would have earnings far in excess of $115,000 which the business had earned in 1953. The pedigree records, breeding flocks, and egg inventory, or their replacements, would always be permanently needed in the business to be carried on by Farms, Inc. It would be impossible to improve the chickens without pedigreeing *223 and a system of pedigree records. The breeding program could not be continued without the breeding records. Petitioner required Farms, Inc., to issue to him $500,000 of bonds rather than a corresponding amount of common or preferred stock because he was not willing to put everything he owned at the permanent risk of the business, and as to this $500,000 he desired to hedge his risk in such manner that would enable him to share with other creditors of the corporation in the event of the corporation running into financial difficulties. The development by a competitor of a chicken equal or superior to the Vantress male would have had a deleterious effect on the profits of Farms, Inc., as it had no substantial source of income other than from the business of breeding and selling the Vantress male line chicken. The six percent per annum interest payments called for by the bonds were always paid on time by Farms, Inc. In January 1956, petitioner transferred the bonds of Farms, Inc., having a face amount of $500,000 to Robinson-Humphrey Company, Inc., (hereinafter sometimes referred to as Robinson-Humphrey) an investment brokerage firm, pursuant to an agreement with that company. *224 This agreement required petitioner to use the funds from the transfer to purchase bonds of state and local governmental bodies or authorities and place them in escrow. Robinson-Humphrey paid petitioner $507,916.67 of which $500,000 represented principal and $7,916.67 represented interest accrued from October 1, 1955, to date of transfer. In accordance with the terms of his agreement with Robinson-Humphrey, petitioner immediately purchased bonds of state or local governmental bodies and placed them in trust with the Trust Company of Georgia as escrow agent for and on behalf of Robinson-Humphrey and petitioner. Vantress agreed to indemnify Robinson-Humphrey against any loss on resale of all or any part of the bonds of Farms, Inc., whether sold singly or in lots during the two-year period beginning August 1, 1956, and ending July 31, 1958, provided that Robinson-Humphrey offered the bonds to Farms, Inc., before resale to any person at less than face value plus accrued interest. This indemnity was secured by placing the Government bonds in escrow until August 1, 1958, at which time they were to be returned to petitioner. The idea of having petitioner sell the bonds to Robinson-Humphrey *225 originated with Roby Robinson of Robinson-Humphrey, who was motivated by a desire to sell petitioner state and municipal bonds, and by a desire to become the investment broker for handling any future financial matters for petitioner and for Farms, Inc. At the time petitioner entered into the transaction with Robinson-Humphrey in January 1956, he knew the financial condition of Farms, Inc., and that there was a possibility that it would shortly be in a position to retire the bonds in the face amount of $500,000. He also knew the prospects for the corporation and for profits were good. A special meeting of the Executive Committee of the Board of Directors of Farms, Inc., was held on July 23, 1956. Petitioner, acting as chairman, brought up for discussion the subject of the corporation's $500,000 of bonds outstanding and held by Robinson-Humphrey. He pointed out that in view of the corporation's excellent earnings during the past year the corporation was in a position, through cash on hand and current bank credit, to retire said bonds. He also noted that the corporation could now borrow from banks for less than six percent. The Executive Committee voted that the bonds be redeemed. *226 On August 10, 1956, Farms, Inc., redeemed, for retirement, the bonds from Robinson-Humphrey and paid Robinson-Humphrey in connection therewith the sum of $526,000, representing the $500,000 face value thereof, plus interest accrued from October 1, 1955, in the amount of $26,000. The bonds were thereupon retired by Farms, Inc. Immediately after the $526,000 payment by Farms, Inc., Robinson-Humphrey released its claim on the bonds of the governmental authorities that petitioner had placed in escrow in accordance with the agreement between petitioner and Robinson-Humphrey. The bonds held in escrow were thereupon returned to petitioner. The sum of $18,083.33, representing the difference between the payment of $526,000 which Robinson-Humphrey received from Farms, Inc., in August 1956 and the sum of $507,916.67 which Robinson-Humphrey paid to petitioner in January 1956, was received and retained by Robinson-Humphrey. No part of such sum of $18,083.33 was paid over to petitioner. Farms, Inc., paid petitioner a salary of $33,600 in its fiscal year ended August 1, 1955, and $72,000 in its fiscal year ended August 31, 1956. Farms, Inc., paid regularly declared dividends during the years *227 ended August 31, 1955, and 1956, in the amounts of $110 and $25,750, respectively. The Federal income tax returns that were filed by Farms, Inc., for the fiscal years ended August 31, 1955, and 1956, reflect the following information: Earned Surplus &
Unidivded Profits
Dividend Paid
Year
Taxable Income
at End of Year
to Stockholders
August 31, 1955
$288,561.51
$288,451.51
$ 110.00
August 31, 1956
857,962.25
931,698.70
25,750.00
Respondent determined that for its first two years of existence Farms, Inc., had taxable income as set forth in the following table. Farms, Inc., is contesting $27,500 of such income for the fiscal year ended August 31, 1955, and $28,500 of such income for the fiscal year ended August 31, 1956. Year
Taxable Income
Fiscal Year Ending 8-31-55
$ 363,131.72
Fiscal Year Ending 8-31-56
1,038,801.55
Total
$1,401,933.27
The balance sheets attached to the Federal income tax returns of Farms, Inc., for the fiscal years ended August 31, 1955, and 1956, show the following: Fiscal Years Ended
8-31-55
8-31-56
Total Assets
$1,434,905.59
$1,594,512.56
Liabilities and Net Worth
Accounts Payable
$ 2,000.00
$ None
Customer Deposits
6,835.00
9,628.60
Employee Tax De-
ductions
2,619.08
8,185.26
Bonds Payable
575,000.00
85,000.00
Preferred Stock
240,000.00
240,000.00
Common Stock
320,000.00
320,000.00
Earned Surplus
288,451.51
931,698.70
Total Liabilities and
Net Worth
$1,434,905.59
$1,594,512.56
*228 In his Federal income tax return for the taxable year 1956, petitioner reported a long-term capital gain of $409,268.30 ($500,000 proceeds less $90,731.70 basis) on the disposition of the bonds, and reported $7,916.67 as being interest received on such bonds. In the statutory notice of deficiency respondent determined that petitioner realized dividend income on the sale of the bonds in January 1956 and subsequent redemption of the bonds in August 1956 in the amount of $526,000. Ultimate Findings of Fact The debenture bonds in the face amount of $500,000 which Chas. Vantress Farms, Inc., issued to Vantress on or about October 1, 1954, were intended to, and in fact did, represent a valid indebtedness of Chas. Vantress Farms, Inc. The transfer of the debenture bonds by Vantress to Robinson-Humphrey was a valid sale. Opinion Respondent contends that the bonds did not represent a bona fide debt due petitioner from the corporation and that when petitioner sold the bonds in 1956 to Robinson-Humphrey and caused Farms, Inc., to redeem them some six months later, he, in effect, received dividend income rather than capital gain as reported on his return. It is respondent's position *229 that the transaction whereby the bonds were issued was unrealistic and a sham for tax avoidance purposes; that the petitioner was obviously trying to capitalize future earnings as debt and attempting to withdraw them as capital gains. The petitioner, on the other hand, contends that the bonds were issued for a valuable consideration, and that they represented a valid indebtedness within the meaning of the statute. It is petitioner's burden to prove that the transaction entered into whereby the bonds were issued did have substance, namely, that a bona fide debt was created. Petitioner has sustained his burden. We have here involved the commonly litigated question of whether the substance of a transaction is different from the form in which it is cast. Petitioner received the bonds in 1954 when he incorporated his sole proprietorship and transferred all of his operating assets to the corporation. In the change-over, petitioner received all of the corporation's outstanding stock as well as the bonds in question. The case presents the factual question of whether the bonds that had a face amount *230 totaling $500,000, represented a debt due petitioner from the corporation. We are not slow to look through a transaction and require satisfactory evidence of its reality and bona fides before we accept it as fact. See Warren Brekke, 40 T.C. 789 (1963) (On appeal C.A. 9, Mar. 24, 1964); National Lead Co., 40 T.C. 282 (1963) (On appeal C.A. 2, Aug. 29, 1963); David L. Leib, 40 T.C. 161 (1963); Carl Shapiro, 40 T.C. 34 (1963); Joseph H. Bridges, 39 T.C. 1064 (1963), affd. 325 F. 2d 180 (C.A. 4, 1963); Victor H. Heyn, 39 T.C. 719 (1963). On the other hand, the doctrine that a taxpayer may arrange his affairs to minimize his taxes, so long as the form he chooses properly reflects the substance of his transactions, is well established. See Hanover Bank v. Commissioner, 369 U.S. 672, 688 (1962); United States v. Cumberland Public Service Co., 338 U.S. 451, 455 (1950); United States v. Isham, 17 Wall, 84U.S. 496, 506 (1873); Albert W. Badanes, 39 T.C. 410, 416 (1962); *231 Arthur J. Kobacker, 37 T.C. 882, 893 (1962); Atchison, Topeka & Santa Fe Railway Co., 36 T.C. 584, 597-598 (1961); L. Lee Stanton, 34 T.C. 1, 8 (1960). Moreover, it is clear that a stockholder may also be a creditor of his corporation, and that this is true, even though he be the sole stockholder. Campbell, Jr. v. Carter Foundation Production Co., 322 F. 2d 827 (C.A. 5, 1963). We are mindful that it is necessary to scrutinize all the facts and circumstances surrounding the purported debt creating transaction, since there is frequently a temptation to cast a capital investment as a loan or sale, and thus convert what is in reality a dividend on invested capital into a reimbursement of indebtedness. Where, however, there is a clear intent of the stockholder to be a lender or seller, and the corporation to be a borrower or purchaser, and all other facts and circumstances are not such as to negative the existence of such an intention by the parties, we think that that purpose should be given effect. *232 Some of the indicia tending to support the validity of a transaction such as is involved herein are: The name given to the certificates, the presence or absence of a maturity date, the source of payments, the right to enforce the payment of principal and interest, participation in management, status with respect to claims of general creditors, debt to equity ratio, and the intention of the parties. John Kelley Co., 1 T.C. 457 (1943), affd. 326 U.S. 521 (1946); Lansing Community Hotel Corp., 14 T.C. 183 (1950). In the matter of form, the bonds present no problem of interpretation. The formal criteria of indebtedness are unquestionably satisfied. The bonds on their face are unconditional promises to pay at a fixed maturity date a sum certain and the payment of interest thereon is not left to anyone's discretion. They confer upon their holders no voting rights or voice in the management of the obligor. The instruments in form are pure evidences of indebtedness. We are impressed by the absence of any unbalance in ratio of Farms, Inc., equity capital to its indebtedness, resulting from the execution *233 of the bonds in question. As material amounts of capital were invested in stock, we need not consider the effect of extreme situations such as nominal stock investments and an obviously excessive debt structure. Respondent asserts that the creation of the debt instruments and the subsequent transfer and redemption of them are part of an over-all plan of petitioner to siphon off the income from Farms, Inc., at capital gains rates. The evidence, however, persuades us that the transfer of the debentures in question to Robinson-Humphrey was not part of such plan. At the time Farms, Inc., was incorporated petitioner had been conducting this breeding business at its present location for only a few months. It is quite doubtful that a local investment brokerage firm, who, at best, only knew petitioner for a few months, would enter into a plan to siphon off profits from a business, new in the area, being conducted as a separate enterprise for the first time. It is not unreasonable, however, that after petitioner became known and established in the community, a local brokerage firm would approach him with an offer to sell securities. Robinson-Humphrey suggested that it purchase the debentures *234 of Farms, Inc., so that it would make a sale of securities it owned and also gain a client whose potential as a future investment purchaser was great. Petitioner urges that the bonds were issued for the nontax reason that he desired to hedge and limit his risk so that, at least to the amount of $500,000, he would be able to share with other creditors in the event of the corporation running into financial difficulties. While petitioner expected substantial profits, he also recognized that the appearance of a chicken developed by competitors that was equal or superior to the Vantress male would have a serious and adverse effect on the corporation's business operations. In Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955), Judge Tuttle, speaking for the Court, stated that there is no authority for the proposition that stockholders of a corporation may not determine just how much they care to risk in the form of capital and how much, if any, they are willing to commit as a creditor. He further points out that stockholders are free to invest capital in their corporation's obligations and to advance additional amounts to assist in its operation, if that is their true *235 intent, thereby always reserving the right to share with other creditors in the distribution of assets if the corporate venture fails. Rowan cites with approval Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F. 2d 718 (C.A. 9, 1949). There the court held that the indebtedness must be recognized where the intent of stockholders is to become creditors so that they may participate equally with other creditors and it is immaterial that the debt was created in connection with the organization of the corporation, that it was the same proportion as the stockholdings, and that it was expected to be repaid out of current earnings. The intention to create a bona fide debtor-creditor relationship is the determinative factor. That intent cannot be vitiated by changed circumstances or by subsequent or newly discovered motivations unforseen at the time the transaction was entered into. We are satisfied that petitioner at all relevant times intended that there be a bona fide indebtedness to him in the amount of $500,000. In view of the substantial investment of petitioner in *236 the stock of the corporation, the equal position of the claims of petitioner to the claims of other creditors, the personal and business considerations which motivated petitioner to cast the transaction in this form, the fact that the payments were to be made to the bondholders without regard to corporate earnings, the provision requiring the payment of interest at a reasonable rate and the absence of any agreement not to enforce collection, we are convinced that the transaction which was completed on or about October 1, 1954, created a bona fide debt of Farms, Inc., rather than a contribution to corporate capital. Sun Properties, Inc. v. United States, 220 F. 2d 171 (C.A. 5, 1955); Warren H. Brown, 27 T.C. 27 (1956); John W. Walter, Inc., 23 T.C. 550 (1954); Ainslie Perrault, 25 T.C. 439 (1955), affd. 244 F. 2d 408 (C.A. 10, 1957), certiorari denied 355 U.S. 830. Respondent is correct in stating that the breeding flocks, breeding records, and egg inventory were necessary to the conduct of the business for which the corporation was formed. Without these assets the corporation could not have carried *237 out its business. These assets were at the risk of the business and they, or their replacements, were continuing assets of the business. Respondent argues that assets transferred to a corporation which are assets essential to the conduct of the business indicates that they were meant to be a part of the capital investment of the transferring party. In support of his position respondent relies on Brake & Elec. Sales Corp. v. United States, 287 F. 2d 426 (C.A. 1, 1961); Charter Wire, Inc. v. United States, (E.D. Wisc. 1961) F. Supp. , affd. 309 F. 2d 878 (C.A. 7, 1962), certiorari denied 372 U.S. 965 (1963); Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957); Sam Schnitzer, 13 T.C. 43 (1949), affd. 183 F. 2d 70 (C.A. 9, 1950), certiorari denied 340 U.S. 911 (1951). See also Moughon v. Commissioner, 329 F. 2d 399 (C.A. 6, 1964), affirming a Memorandum Opinion of this Court. We have carefully considered these authorities and hold that they are not here controlling. In Daytona Marine Supply Co. v. United States, - F. Supp. - (D.C.Fla. 1961), cited by petitioner, three *238 individuals transferred to three newly organized corporations a boat business which had previously been operated by them as partners. In exchange they received from the corporations, in proportion to their previous partnership interests, common stock having a value of around $54,000, and bonds in the amount of approximately $198,000. In that case the respondent also contended that a valid debt cannot be created to acquire essential assets. Rejecting such contention, the court stated, in part, (p. 1656): The Government in this case appears in reality to be contending for a new or novel rule of law to the effect that no bona fide indebtedness for Federal tax purposes can be created where the organizers of a new corporation cause operating assets to be transferred to it as a part of its initial capitalization in return for the issuance of bonds and stock. The Court knows of no such rule of law and no direct authority in support thereof has been cited by Counsel for the Defendant. I do not think it appropriate to enunciate such a rule in this case. To the contrary, a number of cases have been cited to the Court in which debenture bonds and notes have been held to create bona fide indebtedness *239 in situations where assets have been transferred to newly organized corporations by its organizing or promoting stockholders in return for bonds and stock. For a case of this type of fairly recent date decided by the Tax Court, see John W. Walter, Inc., 23 T.C. 550 (1954). See also Sun Properties, Inc. v. United States, 220 F. 2d 171 [47 AFTR 273] (5th Cir. 1955), Estate of Miller v. Commissioner, 239 F. 2d 729 [50 AFTR 1210] (9th Cir. 1956), and Sheldon Tauber, 24 T.C. 179 (1955). * * *
On the particular facts of the instant case, we follow the reasoning in Daytona Marine Supply Co. v. United States, supra. Respondent argues that there was a high degree of tax avoidance motive in this case. A tax avoidance motive must not be considered as evidence that a transaction is something different from what it purports to be. A tax avoidance motive is not, by itself, sufficient to change an outward appearing debt into a capital investment; it would only mean that the transaction should be closely scrutinized to determine whether *240 it was in substance what it appeared to be in form. Sun Properties, Inc. v. United States, 220 F. 2d 171 (C.A. 5, 1955); Chisholm v. Commissioner, 79 F. 2d 14 (C.A. 2, 1935); Gregory v. Helvering, 293 U.S. 465 (1935). We find no merit in respondent's argument that petitioner did not take adequate security measures to safeguard his bond investment and, therefore, the bonds represented capital assets rather than debt. The fact that petitioner incurred some risk in connection with the bonds does not mean that there was an equity investment rather than a debt. Everyone who makes an unsecured loan to a corporation takes a risk, and where the risk is a good one, so that there is reasonable expectation that the debt will be repaid, the fact that such risk is taken by the lender does not justify characterizing the transaction as being an equity investment rather than a true debt. Byerlite Corp. v. Williams, 286 F. 2d 285 (C.A. 6, 1960). The fact that the corporation called the bonds for redemption 3 years prior to the first date on which *241 the bonds provided for redemption is a factor not to be considered lightly. As explained more fully in our Findings, however, the corporation, through cash on hand arising from higher than anticipated profits, and bank credit, was in a position, sooner than expected, to retire said bonds. In addition, the corporation, if it required loans, was now in a position to borrow from commercial banks for less than six percent interest. Robinson-Humphrey's purpose in purchasing the bonds was not to receive interest income from an investment, but to make a sale of Government securities and become the investment broker of petitioner. It, therefore, would have no reason to object to the premature bond redemption and return of its money. In the light of the foregoing and the record as a whole, we are convinced that the transaction involved herein constituted the creation of a bona fide debt owed to petitioner by Farms, Inc., and that petitioner is entitled to capital gains treatment on that part of the proceeds not representing interest. We add for completeness that we have not discussed the transactions of 1958 urged upon us by respondent because we think they are immaterial to the issues *242 in the case before us. We now must determine the amount of interest on the bonds, if any, received by petitioner for 1956 other than $7,916.67 accrued and received at the time of sale of the bonds to Robinson-Humphrey, and reported by petitioner on his income tax return for 1956. Upon the retirement of the bonds in August of 1956, Robinson-Humphrey received from Farms, Inc., principal in the amount of $500,000 and interest in the amount of $26,000. Robinson-Humphrey had already (at the time of the purchase of the bonds) paid to petitioner interest in the amount of $7,916.67 as above set forth, and, in effect, received interest, net, in the amount of $18,083.33 ($26,000 less $7,916.67). No part of the $18,083.33 was in fact paid to petitioner. Respondent, nevertheless, urges that there was no business purpose for the sale of the bonds to Robinson-Humphrey and the whole transaction should be completely disregarded for all purposes. It is respondent's view that the substance of the transaction is that $526,000 was paid to petitioner or was paid for his benefit and thus taxable to him. Petitioner, on the other hand, argues that the sale of the bonds was a valid sale because all *243 rights of ownership of the bonds passed completely from petitioner to Robinson-Humphrey. The suggestion that petitioner should sell the bonds to Robinson-Humphrey originated with Robinson and not with petitioner. Robinson was desirous of selling Government bonds to petitioner and to become the investment broker for handling any future financial matters for petitioner. This was the reason for the sale. Undoubtedly Robinson-Humphrey, in addition to receiving interest on the bonds, also made a commission from the sale of the Government securities. Furthermore, in this area, a sale need have no other business purpose beyond that of realizing a capital gain. W. P. Hobby, 2 T.C. 980 (1943); Sun Properties, Inc. v. United States, 220 F. 2d 171 (C.A. 5, 1955). The fact that under the contract of sale, petitioner gave to Robinson-Humphrey some protection against loss does not prevent the sale from being a valid sale. It is not unusual for a seller to give to a purchaser an assurance *244 of protection against loss such as was given by petitioner to Robinson-Humphrey. Duveen Brothers, Inc., 17 T.C. 124 (1951), affd. 197 F. 2d 118 (C.A. 2, 1952). As stated, supra, petitioner did not receive any part of the $18,083.33. Robinson-Humphrey retained the entire amount which represented interest to that firm for the use of its money for the period from January 1956 until August 1956. Under the circumstances presented, we hold that said sum of $18,083.33 was not taxable income to petitioner in 1956. Decision will be entered under Rule 50.