RUFUS RIDDLESBARGER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19587. Promulgated April 19, 1951.

*Lewis D. Spencer, Esq.*, and *Tim G. Lowry, Esq.*, for the petitioner.
*Charles D. Leist, Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* Respondent has determined that the 2,177 shares of Realty stock and the $50 in cash received by the petitioner in 1942 in exchange for stock in the parent company represented a taxable distribution in the amount of $138,611.05 and that this sum constituted ordinary income to the petitioner in that year under the provisions of sections 22 (a), 115 (a)[4] and 115 (g)[5] or 112 (c)[6] of the

[4] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter (except in section 201 (c) (5), section 204 (c) (11) and section 207 (a) (2) and (b) (3) (where the reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made

\* \* \* \* \* \* \*

[5] (g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[6] SEC. 112. RECOGNITION OF GAIN OR LOSS.
\* \* \* \* \* \* \*

(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), or within the provisions of subsection (1), of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such

Internal Revenue Code. Petitioner treated the exchange as tax free under sections 112 (b) (3)[7] and 112 (g) (1) (D)[8] of the Internal Revenue Code and did not report his gain on the Realty stock and cash he received.

The over-all transaction here in issue was planned and executed in the following manner: On November 9, 1942, the subsidiary declared a dividend to the parent by the conveyance of the Arizona ranch. The parent on November 19, 1942, transferred the ranch to Realty in exchange for 2,312 shares of its capital stock. During the period from December 7 to December 31, 1942, the parent company undertook a recapitalization whereby it distributed to its shareholders 2,205 shares of the Realty stock, $1,800 in cash and its own new capital stock in exchange for the old stock of the parent.

Petitioner selects from this series of transactions the two exchanges between the parent and Realty and between the parent and its stockholders and characterizes them as integral parts of a single "plan of reorganization" within the literal requirements of section 112 (b) (3). Petitioner explains that the requirement that there be a "reorganization" is complied with by the transfer of the ranch to Realty in exchange for all of its stock. See sections 112 (g) (1) (D) and 112 (h).[9] Therefore, petitioner reasons that parent and Realty were parties in a section 112 (g) (1) (D) reorganization and were parties to a re-

paragraph or by subsection (1) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

(2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28. 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property.

[7] SEC. 112. RECOGNITION OF GAIN OR LOSS.

&ast; &ast; &ast; &ast; &ast; &ast;

(b) EXCHANGES SOLELY IN KIND.—

&ast; &ast; &ast; &ast; &ast; &ast;

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

[8] &ast; &ast; &ast; &ast; &ast; &ast;

(g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b) (10) and subsection (1)) and in section 113 (other than subsection (a) (22))—

(1) The term "reorganization" means &ast; &ast; &ast; (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred &ast; &ast; &ast;

[9] SEC. 112. RECOGNITION OF GAIN OR LOSS.

&ast; &ast; &ast; &ast; &ast; &ast;

(h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

organization within the meaning of section 112 (g) (2).[10] Petitioner contends that the exchange between the parent and its stockholders was in pursuance of the exchange between parent and Realty and since the latter exchange was a reorganization within the definition of section 112 (g) (1) (D), then the former exchange was in pursuance of a "plan of reorganization" as required by section 112 (b) (3). Petitioner further argues that the requirement that there be an exchange of stock for stock was met by the parent's distribution of Realty stock and its own new capital stock to its stockholders in exchange for its old capital stock.

We agree that the exchange between the parent and its shareholders met the literal requirements of section 112 (b) (3) of the Internal Revenue Code. See *Hortense A. Menefee*, 46 B. T. A. 865; *Lewis* v. *Commissioner*, 176 F. 2d 646, affirming 10 T. C. 1080; *Estate of Elise W. Hill*, 10 T. C. 1090; *W. N. Fry*, 5 T. C. 1058.

However, in order that petitioner's gain be postponed he must show not only that the exchange literally complied with section 112 (b) (3) but that the new arrangement intrinsically partook of those characteristics and elements of reorganization which underlie the Congressional exemption, and that it was not "merely a vehicle, however elaborate or elegant, for conveying earnings from accumulations to the stockholders." *Bazley* v. *Commissioner*, 331 U. S. 737. The Supreme Court, in *Bazley* v. *Commissioner*, *supra*, specifically stated that:

In the case of a corporation which has undistributed earnings, the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity because cast in the form of a recapitalization-reorganization. The governing legal rule can hardly be stated more narrowly. To attempt to do so would only challenge astuteness in evading it.

Petitioner would have us approach the "reorganization" in issue as a transaction which started with the ranch in the hands of the parent as a dividend received from the subsidiary. However, to ignore the plain fact that the "reorganization" represented only the latter phase of a larger over-all plan, which plan had been thoroughly discussed and finally decided upon long prior to the purported "reorganization" and was actually launched by the severance of the ranch from the subsidiary, would be completely unrealistic and serve only to distort the genuine substance of the whole transaction.

The transaction with which we are here concerned stemmed from

---

[10] (g) DEFINITION OF REORGANIZATION.—As used in this section.

* * * * * * *

(2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

the subsidiary company's decision in 1942 to abandon the hormone development program which it had conducted at the Arizona ranch. At that time, the subsidiary had just settled its differences with the Commissioner concerning its operating expenses for ranch operations and its liability for the surtax under section 102 for the years 1939 and 1940 and there was doubt as to what the Commissioner's attitude would be in respect to these same matters for the years 1941 and 1942. The subsidiary's difficulties with the Commissioner arose to a large degree from the devotion of the ranch and its highly personalized improvements to the use and enjoyment of the petitioner. The ranch represented a substantial part of the subsidiary's accumulated earnings and profits and, serving no further function in the business of the subsidiary after the abandonment of the hormone project, was available for distribution as a dividend. Therefore, it was feared that the Commissioner would also impose the surtax under section 102 with respect to the subsidiary's accumulated earnings and profits for the years 1941 and 1942 should the subsidiary retain the ranch.

The parent company, as the sole stockholder of the subsidiary, was certain to receive the ranch if it was decided to distribute it as a dividend. and the receipt of the ranch by the parent would place it in an equally hazardous position with respect to section 102 for it would then immediately swell the accumulated earnings and profits of the parent which were already in excess of $145,000 as of the end of 1941. As the ranch served no useful function in the business of the parent company, there was no good reason for the parent's retaining it and, therefore, it would be available for distribution as a dividend by the parent. If the parent were simply to declare a dividend consisting of the ranch to its stockholders, including the petitioner. the distribution certainly would be taxable to the stockholders as ordinary income. If the parent were to convey the ranch to its stockholders in exchange for stock in the parent, the best tax result it could hope for would be its treatment as a distribution in partial liquidation under section 115 (c) [11] taxable at capital gains rates, but it still would run a very serious risk of having the distribution taxed as an ordinary dividend under section 115 (g). See *Flanagan* v. *Helvering*, 116 F. 2d 937; *Smith* v. *United States*, 121 F. 2d 692: *Bazley* v. *Commissioner. supra.* The same alternatives and risks were open to the parent company for the distribution of the Realty stock once it had transferred the ranch to Realty in exchange for its stock.

---

[11] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

   •      •      •      •      •      •

    (c) DISTRIBUTION IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112.

Petitioner, who apparently was well aware of the situation, proposed that the ranch be transferred by the subsidiary to a newly organized corporation in exchange for its capital stock which would then be transferred by the subsidiary to the petitioner "on an approximate equal valuation basis" in exchange for Class B common stock in the parent. Filson, the accountant for the subsidiary and parent companies, informed the petitioner that he would incur a tax under that procedure. Filson discussed all of the tax aspects involved and finally suggested an alternative plan whereby the ranch would be distributed as a dividend by the subsidiary to the parent, after which the parent company would organize Realty, transfer the ranch to Realty in exchange for its stock, and thereafter undergo a recapitalization in which it would distribute the Realty stock along with new stock of the parent to its stockholders in exchange for its old capital stock. Extended correspondence was exchanged between the petitioner and Filson, all of it pertaining to the tax consequences of the proposed disposition of the ranch, and the plan proposed by Filson was ultimately adopted.

It is clear from the correspondence between the petitioner and his advisers that the plan was designed and executed so as to accomplish for all practical purposes a distribution of accumulated earnings and profits, and that the sole purpose of the "reorganization" of the parent was to avoid the incidence of any tax on the distribution of the ranch.

Petitioner attempts to refute this conclusion by arguing that a reorganization and recapitalization of the parent were deemed necessary for the future development of additional products and that Realty was organized to acquire a building site for a new factory after the war. However, no expression of business purpose was made until after the final plan for the whole transaction had been drafted and decided upon by the petitioner, Filson, and Eckert, and the correspondence between these persons in formulating the plan leaves no doubt that they were solely concerned with the prospects of a tax-free distribution rather than "business purposes."

A close examination shows beyond all reasonable doubt that the "net effect" of the plan of reorganization was for all practical purposes equivalent to the distribution of a dividend consisting of the ranch and cash to the stockholders of the parent company, particularly the petitioner, and demonstrates the absence of the "business purposes" suggested by the petitioner.

One would think if the parent company genuinely intended to use Realty in the acquisition of a building site and the construction of a new plant, it would have retained control of Realty. However, from the outset the plan contemplated a distribution of the Realty stock to the stockholders of the parent and the distribution was carried out, leaving the parent with less than 5 per cent of the outstanding stock of Realty. It is also interesting to note that it was the parent company

which in 1949 acquired the plant site and began the construction of a new building.

Nor is the petitioner's explanation that the change in the parent's capital structure was made in anticipation of a need for additional funds with which to promote the manufacture and sale of new products consonant with the fact that none of its authorized preferred stock, only a small part of its Class A stock, and less than one-half of its Class B stock had been subscribed for at that time, or the fact that at the close of 1941 it had accumulated earnings of $145,064.17 and in 1942 realized earnings of $10,980.13 apart from the value of the ranch received in that year from the subsidiary. Its dividends in years prior to the "reorganization" never exceeded $2,600. It is difficult under these circumstances to believe that the parent honestly anticipated a need for bringing outside capital into the business.

For that matter, the so-called recapitalization does not appear to us to have resulted in any improvement of the parent's position in raising new capital. The only change made in its capital stock was the authorization of an additional 800 shares of preferred stock at a par value of $50 per share and no change was made in the number of Class A or Class B shares the parent was authorized to issue.

As a result of the so-called recapitalization, substantially all of the stock of Realty was routed directly into the hands of the petitioner. This was accomplished by the exchange of one share of Realty stock, one share of new A stock, and nine shares of new B stock for every block of ten shares of old B stock. As it was provided that shareholders would receive $50 in cash for odd shares of old B stock, those stockholders with less than ten shares of old B stock were completely excluded from acquiring any interest in Realty and as the petitioner owned 21,771, or 94 per cent, of the 23,137 shares of old B outstanding, he was assured of almost complete ownership of Realty and thereby the continued use and enjoyment of the ranch.

Finally, the parent company's distribution of Realty stock and cash to its shareholders represented a distribution of almost one-half of the accumulated earnings and profits of the parent company.

All of the facts and circumstances attendant to the transaction in issue support the respondent's determination that the net effect of the distribution of the Realty stock and the $50 in cash to the petitioner was the same as the distribution of a dividend taxable as ordinary income to the extent of the fair market value of the Realty stock and the $45 realized on the exchange of the odd share of old B for $50 in cash. In 1942, both the subsidiary and the parent companies were faced with tax difficulties under section 102 arising from their excessive accumulations of undistributed earnings and profits. The subsidiary company had never paid a dividend on its common stock prior to 1942. The parent company had never declared a dividend on its

Class B common stock, over 92 per cent of which was owned by the petitioner, and dividends on its Class A common stock never exceeded $2,600 in any year prior to 1942. All of the facts, and particularly the correspondence between the petitioner and Filson, demonstrate that the entire transaction involving the severance of the ranch from the other assets of the subsidiary, the organization of Realty, and the distribution of the Realty stock and cash to the petitioner and the other stockholders of the parent company in exchange for stock in the parent was dominated by a desire of the subsidiary and parent companies to rid themselves of the ranch in order to avoid the imposition of section 102 and at the same time to place the ranch in the hands of the petitioner by some means other than the direct declaration of a taxable dividend.

An analysis of the end results of the completed transaction further demonstrates to our satisfaction that the net effect of the purported "reorganization" was for all practical purposes the same as a distribution of a substantial part of the accumulated earnings and profits of the parent which were at that time available for distribution to the stockholders as ordinary dividends. The record clearly shows that the plan of "reorganization" could not and did not have the effects other than tax avoidance which the petitioner attempts to attribute to it. Although the parties saw fit to cast the transaction in the literal form of a reorganization under sections 112 (b) (3) and 112 (g) (1) (D), it was not, in our judgment, "the kind of transaction with which section 112 (g) 'in its purposes and particulars, concerns itself.'" *Estate of John B. Lewis*, 10 T. C. 1080, affd., 176 F. 2d 646. See also *Flanagan* v. *Helvering*, *supra; Smith* v. *United States, supra; Bazley* v. *Commissioner, supra; James F. Boyle*, 14 T. C. 1382, affd., C. A. 3 (Feb. 27, 1951).

We are, therefore, of the opinion that the Commissioner was correct in determining that the petitioner's income for 1942 should be increased under the provisions of sections 22 (a), 115 (a) and 115 (g) of the Internal Revenue Code by the fair market value of the 2,177 shares of Realty stock and the sum of $45 representing the gain from the $50 in cash received incident to the exchange.

Respondent has taken the position that the 2,177 shares of Realty stock and the cash received by the petitioner in the exchange represented a taxable distribution in the amount of $138,611.05. The sole remaining issue relates to the fair market value of the 2,177 shares of Realty stock as of December 1942, when they were distributed to the petitioner, which in turn depends upon the fair market value of the ranch at that time.

The parties are agreed that the fair market value of the "miscellaneous ranch property" was equal to its undepreciated cost as of

November 1942, or the sum of $26,109.53. Petitioner contends that the fair market value of the remaining properties which we have previously identified herein as the "main dwelling unit" and the "cattle ranch unit" was not in excess of $42,500. Respondent has determined the value of these properties as $121,049.85.

Certain facts material to the question of value are undisputed. The undepreciated cost of the properties in issue as of November 1942 was $121,049.85 which was reflected in the value of $147,159.38 assigned to the ranch by the parent in reporting the receipt of the ranch as a dividend on its 1942 income tax return. The latter amount was subsequently increased by the Commissioner to $153,000, on the basis of which valuation the parent paid an additional tax and thereafter challenged the Commissioner's determination by claims for refund. The ranch was sold in 1947 for an amount in excess of $175,000.

We have also been accorded the benefit of the reports and opinions of six qualified witnesses each of whom independently inspected and appraised the properties in question. The testimony of these experts in our judgment represents a complete analysis of all the factors and conditions material to the fair market value of the ranch. The possibilities of a purchaser using the ranch as a cattle outfit, a "dude ranch", a dairy farm, a boys' camp, as the hobby and residence of a person of substantial wealth and for breeding purebred cattle were thoroughly discussed and opinions were offered as to the value of the ranch to such a purchaser for any one or a combination of such uses.

The prices at which other Arizona properties changed hands, the physical characteristics of such properties, their relative advantages and disadvantages, the circumstances surrounding the sales, and the experiences of the purchasers in putting the properties to various uses were described and discussed. Opinions were expressed as to the relation of the sales price of such properties to the original costs and the reproduction costs in 1942, the effect of various conditions arising from the war, and the probable reaction of purchasers to the luxury items and other unusual features of the ranch which had been installed primarily for the petitioner's personal convenience and enjoyment.

Unfortunately, the greater part of this testimony is highly argumentative, resulting in conclusions as to fair market value which are for all practical purposes completely irreconcilable. The petitioner's three expert witnesses placed the combined value of the "main dwelling unit" and the "cattle ranch unit" at $42,000, $50,000 and $50,000, respectively, whereas the respondent's three experts fixed values of $114,000, $121,164 and $127,000, respectively, for the same properties. Whereas one expert for the respondent placed the

value of the ranch at $60,000 for use as a cattle outfit, one of the petitioner's witnesses stated that in his opinion it had practically no value at all for this purpose. Nor were the experts able to produce what we can fairly regard as an example of the sale of a comparable property.

The sharp disagreement between the experts in respect to every element of value is merely reflective of the inherent difficulty in fixing a fair market value for properties of the unusual character and restricted use and appeal of the ranch in question, and it is not surprising to find that the record points to no specific figure as the only correct fair market value of the ranch as of December 1942.

We have carefully studied all of the known facts. We have considered and weighed all of the observations, arguments and opinions of the expert witnesses, the evidence of other sales of Arizona ranch properties at or about the time in question, the possible uses for the ranch, the original cost, the probable reproduction cost, the effect of war conditions and all of the other evidence material to the question of value. Our best judgment on the basis of all this evidence is that the fair market value of the "main dwelling unit" and the "cattle ranch unit" as of December 1942 was $90,000. The parties having stipulated that the fair market value of the "Miscellaneous ranch property" was $26,109.53, it follows that the total fair market value of the Arizona ranch in December 1942, was $116,109.53. As Realty issued a total of 2,312 shares of stock in exchange for the ranch the Realty shares possessed a fair market value of $50.22 per share, and the 2,177 shares received by petitioner incident to the exchange in issue had a fair market value of $109,328.94.

Therefore, the petitioner, as a result of the exchange in controversy, received a taxable distribution of dividends from the parent company in 1942 in the total amount of $109,373.94.

Reviewed by the Court.

*Decision will be entered under Rule 50.*