W. E. GABRIEL FABRICATION CO., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

WILLIAM E. AND GEORGIE GABRIEL, PETITIONERS, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 89590, 89591.    Filed June 16, 1964.

*William H. Kinsey*, for the petitioners.
*John D. Picco*, for the respondent.

FAY, *Judge:* The respondent determined deficiencies in the income
tax of petitioners William E. and Georgie Gabriel for the taxable
years ended December 31, 1956 and 1957, in the respective amounts
of $29,651.18 and $82.56. Respondent also determined a deficiency
of $146.19 in the income tax of petitioner W. E. Gabriel Fabrication
Co. for the taxable year ended December 31, 1957. William E. Gabriel
will hereinafter be referred to as petitioner.

These proceedings have been consolidated.[1]

The principal issue for decision is whether the distribution by
Gabriel Boiler Co. in late December 1956 of all of the stock in its
wholly owned subsidiary plus certain additional assets to petitioner
in exchange for all of his stock in Gabriel Boiler Co. constituted an
exchange qualifying for nonrecognition under section 355.[2]

---

[1] The petitioners have abandoned some of the issues raised in their pleadings, including
the sole issue in docket No. 89590. As a result, the only year before us is the taxable
year ended Dec. 31, 1956, of William E. and Georgie Gabriel.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of
1954, as amended.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner and Georgie Gabriel are husband and wife and filed their joint income tax returns for the calendar years 1956 and 1957 with the district director of internal revenue at Portland, Oreg.

Petitioner and his brother Chris were, until December 1956, the principal stockholders of Gabriel Boiler Co. (hereinafter referred to as Boiler).[3]  Boiler, an Oregon corporation formed in 1935, had, for at least 5 years prior to October 15, 1955, been actively engaged in the conduct of three lines of business.  These were: (1) The manufacture and installation of boilers and related pressure vessels (hereinafter referred to as the boiler business); (2) the fabrication of structural and plate steel (entailing work on steel frames for buildings, bridges, etc., or the manufacture of steel bins or hoppers and hereinafter referred to as the fabrication business); and (3) the manufacture of canopy covers for tractors (hereinafter referred to as the canopy business).

Petitioner and Chris, until May 2, 1956, were also the principal stockholders in another corporation, Engineering Supply Co. (hereinafter referred to as Engineering).[4]  Engineering was incorporated under the laws of Oregon on December 27, 1945.  Its only significant assets consisted of two buildings and two vacant lots in Portland.  Its sole source of income was derived from renting this property to Boiler.  Neither petitioner nor Chris devoted any time to the affairs of Engineering.  Moreover, Engineering had no employees.  At all times relevant hereto and until sometime in January 1957, Engineering did not actively engage in any business.

Chris had founded Boiler and had been the dominant force in connection with the operation of this corporation.  Chris considered petitioner a nuisance and a hindrance to the effective operation of Boiler.  It was decided during 1955 that petitioner's interest in both Boiler and Engineering would be separated from that of Chris and the remaining stockholders.  The first tangible step taken toward this end occurred in August 1955, when appraisals were made of the assets of both corporations.  Petitioner, contemplating that a portion

---

[3] As of this date the only outstanding stock in Boiler consisted of 1,000 shares of common stock.  Of this number, petitioner owned 312 shares, or 31.2 percent; Chris owned 403 shares, or 40.3 percent; and the remaining stock was held as follows: 40 shares, or 4 percent, by Chris' son; 234 shares, or 23.4 percent, by the mother of petitioner and Chris; and 11 shares, or 1.1 percent of the stock, were owned by two individuals not related to the Gabriels and not otherwise significant for purposes hereof.

[4] Until May 2, 1956, petitioner and Chris each owned 225 shares of stock in Engineering out of a total of 500 shares outstanding, or 45 percent each.  Of the remaining shares, Chris' son owned 49, or 9.8 percent.  Another individual held legal title to 1 share, or 0.2 percent, for purposes of qualification.

of Boiler's operating assets would soon be distributed to him individually, executed on September 14, 1955, an Assumed Business Name Certificate, permitting him, under Oregon law, to conduct a business as a sole proprietorship under the name of W. E. Gabriel Fabrication Co.

The negotiations between petitioner and Chris concerning which assets petitioner was to receive culminated in an agreement dated October 15, 1955, entitled "COUNTER OFFER FROM C. K. GABRIEL TO W. E. GABRIEL" executed by petitioner and Chris. This agreement is hereinafter referred to as the separation agreement. Pursuant to the separation agreement, petitioner agreed to surrender to Boiler all of his stock in that company. In return therefor, petitioner was to succeed to ownership of all of the outstanding stock in Engineering. In addition thereto, Boiler was to transfer the following assets to Engineering or petitioner: (1) The sum of $20,000, (2) equipment and tools having a fair market value of $20,000, and (3) inventory valued at $20,000. The separation agreement further provided that—

the actual manner and mechanics whereby this proposal can be put into effect if accepted by [petitioner], so that [petitioner] can acquire Engineering and take over the fabricating business which has heretofore been operated by [Boiler] in conjunction with its boiler business, and [Chris] is to take over and operate the boiler business, will be determined by [the lawyers and accountants of the parties to the separation agreement].

The equipment, tools, and inventory to be distributed to petitioner were specifically described in the separation agreement and theretofore had been owned and used by Boiler in its fabrication and canopy businesses.

Petitioner and Chris had anticipated at the execution of the separation agreement that the division of their interests would be effected shortly thereafter. However, they were advised that the transaction could be cast in the form of a "tax-free spin-off" but that "It would take time to work out * * * the details of how [the Engineering] stock would be absorbed and changed over."

Without waiting for "these details to be worked out," petitioner and Chris proceeded with their arrangement to divorce petitioner from the affairs and operation of Boiler. As of October 15, 1955, Boiler ceased to engage in the fabrication and canopy businesses. Virtually upon the execution of the separation agreement, Boiler began to deliver to petitioner temporary possession and use of sufficient equipment, tools, and inventory to permit him to begin conducting the fabrication and canopy operations formerly carried on by Boiler. Prior to December 31, 1955, petitioner had received possession of most of the equipment and tools and a substantial portion of the inventory described in the separation agreement. The remaining amounts were transferred to him on a "piecemeal" basis in accordance with his needs

and demands. The transfer had been fully completed substantially prior to November 30, 1956.

Using the assets so distributed to him, petitioner, in the form of a sole proprietorship known as W. E. Gabriel Fabrication Co., did, in fact, engage in the fabrication and canopy businesses for a period of approximately 14 months from October 15, 1955, until at least January 1, 1957. Petitioner's income tax returns for the calendar years 1956 and 1957 reflect his operation of these businesses as a sole proprietorship.

In regard to the $20,000 mentioned in the separation agreement, it was provided that $5,000 cash was to be paid within 10 days after the execution thereof, and the remaining amount was to be paid within the ensuing 24 months in such manner as might be agreed upon. It was agreed that as a temporary expedient Boiler would distribute this money to petitioner through the mechanism of paying a portion of the operating expenses of petitioner's sole proprietorship during the period from October 15, 1955, to November 30, 1956. By November 30, 1956, Boiler had advanced $15,550.46 to petitioner. However, at all times relevant hereto, the amounts advanced on behalf of petitioner were treated by petitioner, Chris, Boiler, and Engineering as advances on open account to petitioner. They were so treated on Boiler's books. When the mechanics and the details concerning the actual manner in which the separation would be effected had been resolved, the account receivable on Boiler's books representing the advances to petitioner was one of the assets transferred to Engineering.

On February 2, 1956, the board of directors of Boiler retroactively ratified the separation agreement and assumed all of the obligations to petitioner mentioned therein. The minutes of this meeting provide, in part:

BE IT FURTHER RESOLVED: That after October 15, 1955, W. E. Gabriel may engage independently of the company in the steel fabrication business and he may use, in the usual course of such business, any inventory of unprocessed materials delivered to his possession in connection with the aforesaid agreement even though he may not have at the time received legal title thereto.

BE IT FURTHER RESOLVED: That the method of transfer of assets as contemplated by said agreement shall be accomplished by what is commonly known as a corporation spin-off which shall be effectuated along the lines recommended by [certain lawyers and accountants].

It was May 2, 1956, before any action relating to the stock of Engineering was taken by petitioner and Chris. At that time petitioner, Chris, and his son transferred to Boiler, in a tax-free exchange, all of their stock [5] in Engineering and in return received shares in Boiler, as follows:

---

[5] The record does not indicate what happened to the 1 share of Engineering stock held for qualification purposes. Cf. fn. 4, *supra*.

| Shareholder | Number of Engineering shares transferred | Number of Boiler shares transferred |
| --- | --- | --- |
| Petitioner | 225 | 180 |
| Chris | 225 | 180 |
| W. W. Gabriel (Chris' son) | 49 | 40 |

By virtue of this exchange, Engineering became a wholly owned subsidiary of Boiler.

On November 30, 1956, Boiler's board of directors adopted the following resolution:

BE IT RESOLVED that [Boiler] contribute the below listed assets to the capital surplus account of its wholly owned subsidiary [Engineering], in order that [Engineering] may be adequately capitalized to engage in the business of the manufacture, sale, repair and distribution of canopy tops and in miscellaneous structural steel work.

| | |
| --- | --- |
| Account owing by W. E. Gabriel to Gabriel Boiler Co | $15,550.46 |
| Machinery and tools | [1] 5,000.00 |
| Inventory | 20,000.00 |
| Total | 40,550.46 |

[1] This figure represents Boiler's adjusted basis in the machinery and tools transferred to petitioner. Although located in one of the buildings which Engineering owned and leased to Boiler, the equipment and tools described in the separation agreement belonged to Boiler until Nov. 30, 1956. The equipment and tools located in this building were, according to an appraisal conducted in Aug. 1955, found to have a fair market value of $34,461.95. However, not all of the equipment and tools described in the August appraisal were transferred to Engineering, for pursuant to the separation agreement, equipment specifically described therein and having an aggregate fair market value of $5,534.90 was retained by Boiler. Moreover, certain equipment and tools transferred to Engineering and which according to the appraisal were found to have an aggregate value of $5,578.60 were actually worthless. Therefore, Engineering received equipment and tools having an aggregate fair market value of $23,348.45 in connection with this distribution.

Pursuant to a resolution of its board of directors dated December 20, 1956, Boiler, in late December 1956, distributed to petitioner all of the outstanding stock in Engineering, a non-interest-bearing promissory note in the amount of $4,449.54, and a used automobile worth approximately $800. In connection therewith, petitioner surrendered to Boiler all of the shares of stock he owned in that company.

About a week thereafter, petitioner transferred his sole proprietorship to Engineering in a transaction in which no gain or loss was recognized in whole or in part.

Petitioner had a basis of $10,840.25 in the shares of Boiler stock surrendered by him in December 1956. The shares of Engineering stock distributed by Boiler to petitioner in December 1956 had a fair market value in excess of $10,840.25.

Respondent in his statutory notice of deficiency determined that petitioner's exchange of his stock in Boiler for all of the outstanding stock in Engineering in 1956 did not qualify as a distribution of stock of a controlled corporation pursuant to section 355(a)(1) because the

requirements as to "active business" set forth in sections 355(b)(1) and 355 (b)(2) were not satisfied. Respondent further determined that the exchange did not qualify for nonrecognition under any other provisions of the Internal Revenue Code of 1954 but that it constituted a taxable exchange of petitioner's stock in Boiler wherein petitioner realized in 1956 a long-term capital gain in the amount of $116,526.24.

### OPINION

Petitioner contends that the various steps taken to separate Boiler's fabrication and canopy businesses from its boiler business should be regarded as integral parts of a transaction qualifying as a corporate separation under section 355.[6]    These steps included: (1) The execution of the separation agreement on October 15, 1955; (2) Boiler's delivery to petitioner of temporary possession and use of certain equipment, tools, and inventory theretofore used by Boiler in the conduct of its fabrication and canopy businesses; (3) petitioner's utilization of these assets for a period of approximately 14 months in connection with the operation of a sole proprietorship which continued to carry on the fabrication and canopy businesses formerly conducted by Boiler; (4) the transfer on November 30, 1956, by Boiler to Engineering, its wholly owned subsidiary, of legal title to the various assets which Boiler had permitted petitioner to use; (5) Boiler's distribution in December 1956 of all of the stock in Engineering to petitioner in ex-

---

[6] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities,

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then, no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

change for all of his stock in Boiler; and (6) petitioner's transfer of his sole proprietorship to Engineering in the early part of January 1957 in a transaction in which no gain or loss was recognized.

Section 355 deals with corporate separations and provides, insofar as is relevant hereto, that a shareholder of a distributing corporation shall not recognize gain or loss upon the receipt of stock if the following conditions are satisfied:

(1) A corporation distributes to its shareholders, with respect to their stock, solely stock of a corporation which it controlled immediately before the distribution;

(2) the transaction was not used principally as a device for distributing the earnings and profits of either corporation;

(3) the requirements of section 355(b) relating to the active conduct of a trade or business are satisfied; and

(4) all of the stock of the controlled corporation held by the distributing corporation is distributed to its shareholders.

Respondent concedes that conditions (1), (2), and (4) above have been satisfied.[7] It is respondent's contention, however, that the separation of Boiler's assets does not qualify for nonrecognition of gain because the provisions in section 355(b),[8] relating to the active conduct of a trade or business, have not been satisfied. Respondent takes the

---

[7] Both petitioner and respondent recognize that in the event that the transaction before us qualifies for nonrecognition under sec. 355 the additional property distributed to petitioner, other than the stock in Engineering, would constitute "boot" pursuant to sec. 356(a)(1).

[8] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporaton which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (b), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

position that Boiler's distribution to petitioner in December 1956 of certain assets, consisting primarily of all of the outstanding stock in Engineering, in exchange for all of petitioner's stock in Boiler constituted a distribution in redemption of petitioner's stock pursuant to section 302(a).[9] We must decide whether respondent was correct in determining that Boiler's distribution of the Engineering stock to petitioner did not satisfy the active business requirements of section 355(b).

Insofar as is pertinent hereto, subsection (b) of section 355 provides that the nonrecognition provisions of subsection (a) thereof shall apply only if the distributing corporation and the controlled corporation are, immediately after the distribution of the stock of the controlled corporation, engaged in the active conduct of a trade or business. Sec. 355(b)(1)(A).

On the basis of the facts before us, we have found that Boiler, the distributing corporation, was, immediately after the distribution of the Engineering stock to petitioner, engaged in the active conduct of the boiler business and that Boiler had actively conducted that business throughout the 5-year period ending on the date of distribution.

It is also apparent that immediately after the distribution Engineering, which had been the controlled corporation, was engaged in the active conduct of the fabrication and canopy businesses.[10] The fact that the actual transfer of these businesses to Engineering occurred about a week after the distribution of the Engineering stock to petitioner does not affect this conclusion, since this was one step in an integrated transaction, the various parts of which it had been expected would take place contemporaneously. *H. Grady Lester, Jr.*, 40 T.C. 947, 959 (1963).

In subsequent portions of section 355(b), however, additional requirements are set forth relating to whether a distributing or a controlled corporation shall be treated as engaged in the active conduct of a trade or business. These provisions provide that a corporation may be regarded as engaged in the active conduct of a trade or business only if, *inter alia*, such trade or business has been actively conducted

---

[9] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

[10] Petitioner does not attempt to argue that the "requirements as to active business" imposed by sec. 355(b) were satisfied by Engineering's rental activities. Moreover, it does not appear that petitioner could sustain such an argument. Engineering's rental activities terminated several days prior to the distribution of its stock to petitioner. Furthermore, it is by no means clear that rental activities conducted by Engineering could have been regarded as the active conduct of a trade or business for purposes of sec. 355(b). Cf. *Isabel A. Elliott*, 32 T.C. 283 (1959) ; *Theodore F. Appleby*, 35 T.C. 755 (1961), affd. 296 F. 2d 925 (C.A. 3, 1962), certiorari denied 370 U.S. 910 (1962) ; *Bonsall* v. *Commissioner,* 317 F. 2d 61 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; and *Curtis* v. *United States,* 215 F. Supp. 885 (D. Ohio 1963).

throughout the 5-year period ending on the date of the distribution (see sec. 355(b)(2)(B)) and such trade or business was not acquired within such 5-year period in a transaction in which gain or loss was recognized in whole or in part (see sec. 355(b)(2)(C)).

Although Engineering was engaged in the active conduct of the fabrication and canopy businesses immediately after Boiler distributed the Engineering stock to petitioner, we have found that neither of such businesses had been actively conducted by Boiler or Engineering throughout the requisite 5-year period. Thus, although the record indicates that Boiler had begun to engage in the fabrication and canopy businesses substantially prior to the start of the 5-year period preceding the distribution of the Engineering stock to petitioner in December 1956, we have found that Boiler ceased to engage in the conduct of such businesses on October 15, 1955. At this time, it began to turn over temporary possession and use to petitioner of the assets formerly employed by Boiler in the operation of such businesses. Boiler ceased to engage in the fabrication and canopy businesses approximately 14 months prior to the expiration of the requisite 5-year period set forth in section 355(b)(2)(B).

Respondent has at no time in connection with this proceeding determined or contended that the transaction whereby petitioner, in his individual capacity, obtained temporary possession and use of the assets theretofore used by Boiler in the fabrication and canopy businesses constituted a taxable transaction. Nor do we believe that respondent could properly do so upon the basis of the circumstances before us. The facts before us are entirely consistent with our finding that Boiler merely delivered to petitioner temporary possession and use of the assets theretofore employed by Boiler in its fabrication and canopy businesses. Petitioner and his brother Chris were at odds concerning the operation of Boiler. Chris, who had founded that corporation and who was the dominant factor in its operation, wanted to "get petitioner out of his hair" as soon as possible. It was contemplated that petitioner would receive a portion of the assets of Boiler and Engineering constituting his allocable share and sufficient in character and amount to permit him to take over from Boiler two of the lines of business conducted by it. Once petitioner and Chris had agreed, pursuant to the separation agreement, upon the assets petitioner would receive, it was decided that petitioner would thenceforth dissociate himself from the operation of Boiler and that he would be permitted to use those assets in the operation of a sole proprietorship, even though the mechanics of the separation had not been worked out as of that date.

The resolution adopted by Boiler's board of directors on February 2, 1956, retroactively ratified the terms of the separation agreement and specifically approved of the arrangement whereby petitioner was given

temporary use of the assets which Boiler had used in its fabrication and canopy businesses. Under the circumstances before us, the delivery to petitioner of possession and use of the fabrication and canopy assets in 1955 does not appear to us to represent compensation. Moreover, we do not believe that said delivery of assets constitutes the distribution of a dividend to petitioner. Nor does it appear to be a distribution to petitioner in exchange for any of his stock in Boiler, for petitioner did not surrender any of his stock in Boiler until December 1956, when Boiler distributed all of the Engineering stock and certain other assets to him. Despite the fact that petitioner had the use of these assets for approximately a period of 14 months, petitioner never had legal title thereto. Moreover, as evidenced by the resolution of Boiler's board of directors dated November 30, 1956, whereby legal title to these assets was transferred to Engineering, it would appear that Boiler maintained effective control over these assets despite petitioner's utilization of them. Upon a consideration of all the circumstances before us, it is our conclusion that the delivery of assets during 1955 and 1956 by Boiler to petitioner for use in connection with his sole proprietorship was not a taxable transaction, but was more in the nature of a loan, the purpose of which was to eliminate petitioner from the affairs of Boiler as expeditiously as possible.

Therefore, respondent's only ground for claiming that the distribution by Boiler to petitioner in December 1956 failed to meet the active business requirements of section 355(b) and consequently was disqualified from nonrecognition treatment under section 355(a) is that the transaction did not meet the 5-year requirement set forth in section 355(b)(2)(B). It is respondent's position, in essence, that, in order to satisfy the active business requirements of section 355(b), the business or businesses conducted by Engineering, the controlled corporation, immediately after the distribution must have been conducted by Boiler or Engineering, or acquired by them in a tax-free transaction, during the 5-year period prescribed by section 355(b)(2)(B). Respondent contends that Boiler's cessation of the fabrication and canopy businesses on October 15, 1955, approximately 14 months prior to the expiration of the requisite 5-year period, constitutes a failure to satisfy the 5-year rule of section 355(b)(2)(B).

Petitioner disputes this contention and raises a novel argument concerning the interpretation of the 5-year rule of section 355(b)(2)(B). Conceding that pursuant to section 355(b)(2)(B) the trade or business conducted by both the distributing corporation and the controlled corporation immediately after the separation is required to have "been actively conducted throughout the 5-year period ending on the date of the distribution," petitioner, however, argues that there is no requirement in section 355, the Income Tax Regulations thereunder, or in any other section of the Code, that the trade or business

conducted during the 5-year period shall have been conducted by either the distributing corporation or the controlled corporation. Petitioner contends that the trade or business could have been conducted during this period by some third party, such as a corporation not related to either the distributing corporation or the controlled corporation, or even by a sole proprietorship. Petitioner then states that his operation of the fabrication and canopy businesses in the form of a sole proprietorship during the 14 months prior to the distribution of the Boiler stock may properly be added onto the period during which Boiler conducted these businesses. He concludes that as a result of this, the 5-year requirement of section 355(b)(2)(B) has been satisfied.[11] We agree with petitioner.

The counterpart of section 355 originally introduced in the House of Representatives (H.R. 8300, 83d Cong., 2d Sess., sec. 353 (1954)) substantially departed from the tax treatment afforded corporate separations under then existing law. The Senate Finance Committee rejected the approach taken in the House bill. In redrafting this provision, the Senate Finance Committee introduced the requirement of the active conduct of a trade or business both before and after the distribution in order to provide a safeguard against tax avoidance not contained in then existing law. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., pp. 50–51 (1954). Under then existing law, corporate separations falling into the category of "split-ups" or "split-offs" could qualify for nonrecognition of gain or loss under the applicable reorganization provisions, and there was no "active business" requirement.[12] Cf. *Riddlesbarger* v. *Commissioner*, 200 F. 2d 165 (C.A. 7, 1952), reversing 16 T.C. 820 (1951); and *Rena B. Farr*, 24 T.C. 350 (1955). There was, however, an active business requirement in connection with "spin-offs," but this requirement dealt with the active conduct of a trade or business by the distributing corporation and the controlled corporation after the separation. See sec. 112(b)(11), I.R.C. 1939, as added by the Revenue Act of 1951, 65 Stat. 493.

The language of the Senate Finance Committee report accompanying section 355 is in no way inconsistent with petitioner's contention.

[11] For a similar view, see Mintz, "Corporate Separations," 36 Taxes 882, 883, fn. 8. See also Cohen, Silverman, Surrey, Tarleau, and Warren, "The Internal Revenue Code of 1954: Corporate Distributions, Organizations, and Reorganizations," text at fn. 255, 68 Harv. L. Rev. 427.

[12] Prior to enactment of the Internal Revenue Code of 1954, corporate divisions had, in tax jargon, been traditionally classified into three different types, the "split-up," the "split-off," and the "spin-off." In a "split-up," the original corporation would transfer all of its assets to two new corporations and then distribute their stock to its shareholders in complete liquidation. A "split-off" involved a transfer of part of the original corporation's assets to a new corporation, followed by a distribution of the new corporation's stock in exchange for part of the stock of the original corporation. A "spin-off" differed from a "split-off" only in that no stock of the transferor was surrendered by its stockholders upon their receipt of the transferee's stock.

Thus, in explaining the "active business" requirements of the section, the Senate Finance Committee noted:

Present law contemplates that a tax-free separation shall involve only the separation of assets attributable to the carrying on of an active business. Under the House bill, it is immaterial whether the assets are those used in an active business but if investment assets, for example, are separated into a new corporation, any amount received in respect of such an inactive corporation, whether by a distribution from it or by a sale of its stock, would be treated as ordinary income for a period of 10 years from the date of its creation. Your committee returns to existing law in not permitting the tax free separation of an existing corporation into active and inactive entities. It is not believed that the business need for this kind of transaction is sufficiently great to permit a person in a position to afford a 10-year delay in receiving income to do so at capital gain rather than dividend rates. Your committee requires that both the business retained by the distributing company and the business of the corporation the stock of which is distributed must have been actively conducted for the 5 years preceding the distribution, a safeguard against avoidance not contained in existing law.

S. Rept. No. 1622, *supra* at 50–51.

There is nothing in the statute or the Senate Finance Committee report suggesting that the business or businesses conducted immediately subsequent to the distribution shall have been conducted by either the distributing corporation or the controlled corporation prior to the distribution.

Although the legislative history of the Internal Revenue Code of 1954 sheds little light on this, the particular type of the avoidance sought to be curbed by these rather rigid requirements of section 355(b) was the transfer of accumulated earnings by one corporation to a subsidiary so that these earnings could be withdrawn as capital gains, either through the liquidation of the subsidiary or the sale of its stock. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). See also 3 Mertens, Law of Federal Income Taxation, sec. 20.103.

It would appear that section 355(a)(1)(B), which requires that the transaction not be used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation, directly deals with this problem. However, it may have been that the Senate believed that more definite standards were required to implement the successful operation of section 355. The 5-year requirement of section 355(b)(2)(B) seems to us no more than a legislative rule of thumb designed to provide some assurance that the split-off or spun-off corporation would not be liquidated or sold shortly after the distribution of its stock. We can only surmise why Congress selected a 5-year period, but it may have been believed that if a business had been continuously conducted for that period it would be profitable and, therefore, not lightly abandoned.[13]

[13] See Palestin, "Tests for Tax-Free Distributions on Corporate Division," 38 Taxes 327, 329–330 (1960).

As indicated earlier, Congress inserted another test in section 355 (b) that must be met if the "active business" requirement is to be considered as having been satisfied. Thus, section 355(b) (2) (C) provides that the trade or business conducted by the distributing or the controlled corporation immediately after the distribution must not have been acquired in a transaction in which gain or loss was recognized in whole or in part. It is difficult to discern the specific purpose of Congress in inserting this particular provision.[14] However, the effect of the provision is extremely clear. By virtue of it, corporations are not permitted to separate, in a tax-free transaction, businesses acquired during the 5 preceding years in a transaction in which gain or loss was recognized in whole or in part. Under present statutory provisions, however, a business may be separated without the recognition of gain, even though acquired within the requisite 5-year period if (1) such business was acquired in a transaction in which gain or loss was not recognized in whole or in part, and (2) such business had been actively conducted by either the acquiring corporation or its predecessor throughout the requisite 5-year period. In connection with such a separation, the distributing corporation would be permitted to transfer to the controlled corporation, without the recognition of gain, retained earnings in order to finance the separated business. This type of separation would comply with the provisions of section 355(b), even though the business to be separated had been acquired by the distributing corporation 1 day prior to the separation, so long as the acquisition constituted a transaction in which no gain or loss was recognized, in whole or in part.

We see no difference, for purposes of qualification under section 355(b), between such a transaction and the one presently before us, where (1) the businesses conducted by Engineering, the controlled corporation, immediately after the distribution had been actively conducted by Boiler or petitioner throughout the 5-year period preceding the date of distribution; (2) petitioner did not acquire such businesses in a transaction in which gain or loss was recognized in whole or in part; and (3) such businesses were transferred by petitioner to Engineering, contemporaneously with the distribution of the Engineering stock, in a transaction in which no gain or loss was recognized in whole or in part.

It is our opinion, therefore, that the distribution of the Engineering stock to petitioner in December 1956 not only complies with the language of section 355 but also satisfies the Congressional purposes un-

[14] One group of noted authorities has concluded that:

"This requirement is apparently intended to prevent temporary purchases of going businesses as a method of distributing liquid assets to shareholders. Accordingly, the test has the general purpose of differentiating between acquisitions for cash or other liquid assets, which will not qualify, and acquisitions for stock, which will qualify."

See Cohen, Silverman, Surrey, Tarleau, and Warren, *supra* fn. 11, at 430.

derlying the particular language of the statute. Therefore, it qualifies for nonrecognition pursuant to section 355.

Petitioner had a basis of $10,840.25 in the shares of Boiler stock he surrendered in December 1956. The shares of Engineering stock distributed to him by Boiler at that time had a fair market value in excess of $10,840.25. The additional assets distributed to petitioner in connection therewith, consisting of Boiler's promissory note in the amount of $4,449.54 and a used automobile with a fair market value of $800, constitute "boot" taxable under section 356(a)(1).[15] See sec. 1.355–2, Income Tax Regs., and cf. the alternative argument made by the Commissioner in *Albert W. Badanes*, 39 T.C. 410, 416–417 (1962).

Reviewed by the Court.

> *Decision will be entered for the respondent in docket No. 89590.*
>
> *Decision will be entered under Rule 50 in docket No. 89591.*

BRUCE, *J.*, concurs in the result.

---

[15] SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.
  (a) GAIN ON EXCHANGES.—
    (1) RECOGNITION OF GAIN.—If—
      (A) section 354 or 355 would apply to an exchange but for the fact that
      (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money,
  then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

