ALBERT W. BADANES AND CORINNE S. BADANES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88632. Filed November 19, 1962.

*William R. Seaman, Esq.*, for the petitioners.
*John J. Larkin, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined a deficiency in petitioners' income tax for the calendar year 1957, in the amount of $51,062.41.

The issues to be decided are:

(1) Whether a transaction, wherein the principal petitioner exchanged all his holdings of stock in a parent corporation for all the issued and outstanding stock of another corporation which was then

a subsidiary of said parent corporation, qualifies for nonrecognition of gain under section 355 of the 1954 Code.

(2) Whether, in the alternative, if it should be decided that the principal petitioner's receipt of the stock of the subsidiary did not result in any recognized gain with respect to the stock received, he nevertheless should be charged with the *constructive* receipt of "boot" in said exchange transaction, that is taxable as capital gain under section 356(a) of the 1954 Code.

Another issue raised by the pleadings, relating to the amount allowable to petitioners as a deduction for medical expenses, is dependent on the outcome of the above-mentioned issues; and any adjustment with respect thereto will be handled in the computation to be made herein under Rule 50.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference.

Petitioners Albert and Corinne Badanes are husband and wife residing in Terrace Park, Ohio. They maintained their books and records in accordance with the cash receipts and disbursements method, and on a calendar year basis. For the taxable year here involved, they filed a joint income tax return on said cash basis, with the district director of internal revenue at Cincinnati, Ohio. The term "petitioner," when used herein in the singular, will have reference to the husband Albert Badanes.

Barq Bottling Company, Inc. (hereinafter called Barq-Cincinnati), was a corporation organized in 1938 under the laws of the State of Ohio. It engaged in the business of bottling and distributing soft drinks through two bottling and distributing plants located in Cincinnati and at Portsmouth, Ohio. Immediately prior to December 31, 1957, it had total paid-in capital of $12,000 represented by 120 shares of common stock of the par value of $100 per share; and all of its issued and outstanding shares were owned in equal portions by petitioner and an individual named Richard S. Tuttle, both of whom were active in the management of the company. Since 1950, said corporation had carried on its business operations in Cincinnati and Portsmouth, on premises which it leased from another corporation named the Fort Washington Realty Co.

Fort Washington Realty Co. (hereinafter called the Realty Company) was incorporated in 1950 under the laws of the State of Ohio. As hereinabove stated, it leased to Barq-Cincinnati for use in the latter's business, certain commercial buildings and real estate which it owned in Cincinnati and Portsmouth, Ohio. Immediately prior to December 31, 1957, Realty Company had total paid-in capital of

$7,000, represented by 70 shares of common stock of a par value of $100 per share, which were owned in equal portions by petitioner and said Richard S. Tuttle. The real properties of the Realty Company were encumbered by mortgages which, at December 31, 1957, aggregated approximately $57,300; and the larger of these mortgages in the amount of about $43,000 was guaranteed by Barq-Cincinnati.

Some time prior to 1957 petitioner and Tuttle began to experience friction and conflicts with one another with regard to the management of Barq-Cincinnati, by reason of differences in their personalities and also differing ideas regarding the corporation's products, prices, and plant operations. The result of this was that early in 1957, they decided to terminate their close business association of many years, and to provide for some equitable division of their common business interests. Accordingly, as of January 25, 1957, they prepared a written agreement in letter form, which in substance and so far as here material, provided as follows:

1. Petitioner and Tuttle were to transfer to Barq-Cincinnati all of the issued and outstanding shares of Realty Company stock which, as before stated, were held by them in equal portions. These transfers of shares were to be made as contributions by them to the capital of Barq-Cincinnati.

2. A new corporation, to be known as Barq Bottling Company of Portsmouth, Ohio (hereinafter called Barq-Portsmouth), was to be immediately organized under the laws of Ohio; and thereupon certain assets of Barq-Cincinnati were to be transferred to this corporation in exchange for the issuance to Barq-Cincinnati of all the issued and outstanding stock of such new corporation. The assets of Barq-Cincinnati which were thus to be transferred to the new corporation for its stock, were to consist principally of: (A) All of the operating assets of the Portsmouth plant which Barq-Cincinnati had operated for more than 5 years as one of its divisions; (B) cash in the amount of $90,000, subject to adjustment for variation in the values assigned to the above-mentioned operating assets; and (C) two life insurance policies on the life of petitioner which were owned by Barq-Cincinnati and which had an aggregate cash value of approximately $5,350. It was contemplated that after the new corporation had acquired such assets, it would lend $35,000 to Barq-Cincinnati against the latter's negotiable promissory note. It also was planned as part of the contemplated transaction, that Barq-Cincinnati would be relieved from its above-mentioned guarantee on the mortgage on the Realty Company property.

3. Finally, Barq-Cincinnati would transfer to petitioner all the issued and outstanding shares of the capital stocks of Barq-Portsmouth and of Realty Company, in exchange for petitioner's surrender

to Barq-Cincinnati of all his shares in that corporation. The net result would be that, after all the above steps had been taken, Tuttle would be the sole shareholder of Barq-Cincinnati and petitioner would be the sole shareholder of both Barq-Portsmouth and Realty Company.

As one of the steps of the above-mentioned agreement, Barq Bottling Company of Portsmouth, Ohio, was incorporated in March 1957 under the laws of the State of Ohio.

Subsequently, petitioner and Tuttle conferred further with each other and with their attorneys, with the result that they mutually agreed on various revisions to their prior agreement. Then, on December 31, 1957, they gave effect to the revised agreement, by doing the following:

1. Petitioner and Tuttle contributed to Barq-Cincinnati as capital contributions, all of the stock which they held in the Realty Company, thereby causing Barq-Cincinnati to become the sole stockholder of the Realty Company.

2. Barq-Cincinnati transferred to Barq-Portsmouth, solely in exchange for all the shares of the latter's stock, the following: (A) All the shares of the Realty Company; (B) cash of approximately $78,900, which was less than the amount contemplated in the original agreement for division of the business interests; and (C) all the operating assets of what had theretofore been the Portsmouth division of its business.[1] The result of all this was that Barq-Portsmouth became the owner of all the Portsmouth operations and also the sole stockholder of the Realty Company; and that Barq-Cincinnati became the sole stockholder of Barq-Portsmouth, holding all of its 334 shares of stock.

3. Barq-Cincinnati then distributed to petitioner, in exchange for all his 60 shares of that company's stock, all the issued and outstanding shares of the stock of Barq-Portsmouth (being said 334 shares). The result of this was that petitioner thereupon became the sole stockholder of Barq-Portsmouth which, in turn, was the sole stockholder of the Realty Company; and that Tuttle thereupon became the sole stockholder of Barq-Cincinnati.

4. Finally Barq-Portsmouth loaned to Barq-Cincinnati upon the latter's negotiable promissory note, the amount of $28,000 which was less than the amount contemplated in the original agreement for division of the business interests.

Following completion of all the foregoing transactions, Barq-Portsmouth continued to carry on, at all times here material, the business

---

[1] Actually, about $2,300 cash together with certain trucks were transferred at the time when Barq-Portsmouth was incorporated in March 1957; and approximately $76,600 cash, together with the other properties, were transferred on December 31, 1957.

of bottling and distributing soft drinks in the Portsmouth area, which formerly had been carried on by Barq-Cincinnati as one of its divisions. Also thereafter, Barq-Cincinnati continued to carry on, at all times here material, the business of bottling and distributing soft drinks in the Cincinnati area, which formerly had been carried on by its Cincinnati division. Furthermore, following the above transactions, Realty Company continued to own the same improved real properties; and it thereafter leased the same to Barq-Cincinnati and Barq-Portsmouth, respectively, for use in their separate businesses.

About 1 year after the above transactions, which was subsequent to the taxable year here involved, Barq-Portsmouth and its subsidiary, the Realty Company, made certain arrangements whereby the mortgage indebtedness on the Realty Company's real estate was discharged, and whereby Realty Company then dissolved and distributed all its assets to Barq-Portsmouth in complete liquidation.

The petitioner and his wife, in their joint income tax return for the year 1957, disclosed the above-mentioned transactions; but they did not report the realization of any gain or loss therefrom.

The respondent, in his notice of deficiency herein, determined: (1) That the transaction wherein petitioner received all the issued and outstanding shares of stock of Barq-Portsmouth did not qualify for nonrecognition of gain under section 355 of the 1954 Code, so that petitioner derived capital gain therefrom; and (2) that, in the alternative, if the transaction did qualify for nonrecognition of gain to the extent of the Barq-Portsmouth stock, petitioner nevertheless received other property as "boot," consisting of some of the cash and all of the Realty Company stock, which was taxable to him partly as dividends and partly as capital gain.

### ULTIMATE FINDINGS OF FACT.

No cash and no stock of the Realty Company were transferred to petitioner by Barq-Cincinnati in connection with the transactions of December 31, 1957; and no cash and no Realty Company stock were received by petitioner in connection with said transactions.

### OPINION.

### I.

The first issue involves the question, whether the above-mentioned transactions of December 31, 1957, qualify for nonrecognition of gain under section 355 of the 1954 Code. We think that said question must be answered in the affirmative.

In this Court's recent case of *Edmund P. Coady*, 33 T.C. 771, affd. 289 F. 2d 490 (C.A. 6), wherein the Court of Appeals for the Sixth Circuit stated that our conclusions and application of the statute were

correct, we held that for a transaction to come within section 355 of the 1954 Code, four statutory conditions must be satisfied. These conditions and the manner in which we believe they were satisfied in the present case may be summarized as follows:

1. The distributing corporation must distribute solely stock or securities of a corporation which it controlled immediately prior to the distribution.

Here, the distributing corporation was Barq-Cincinnati; and it distributed solely stock of Barq-Portsmouth, which was a corporation that it controlled immediately prior to the distribution. There were no "securities" of Barq-Portsmouth which had been issued by it.

2. The distribution must not be used principally as a device for distributing the earnings and profits of the distributing corporation, or of the controlled corporation, or of both.

Here, as in the *Coady* case, the principal purpose of the transactions was to enable two businessmen, who could no longer agree between themselves as to the proper means for advancing their common business interests, to separate their interests and thereafter conduct through two corporations the businesses which they had theretofore conducted through the use of a single corporate entity. We believe that such purpose was a sound and valid business purpose; and that the clear implication of the *Coady* case is that Congress, in enacting section 355, intended to provide a means whereby a separation motivated by such a purpose could be accomplished without the deterrent effect of being subjected to tax. Moreover, there is no evidence herein that the principal purpose of the transactions involved was other than the business purpose above mentioned; and respondent has presented no argument to the contrary.

3. The 5-year active business requirements of section 355(b) must be satisfied.

Here, Barq-Portsmouth was incorporated for the specific purpose of carrying on the active business which had theretofore been carried on for more than 5 years as a division of Barq-Cincinnati; and the respondent's regulations indicate that in such circumstance, the new corporation is entitled to have the benefit of the 5-year active business experience of the preexisting division. Income Tax Regs., sec. 1.355–1(d), Example (8). Also, the parties have stipulated herein that both Barq-Cincinnati and Barq-Portsmouth engaged continuously after December 31, 1957, in the active conduct of their respective businesses.

4. The distributing corporation must distribute all the stock and securities of the controlled corporation.

Here, Barq-Cincinnati did distribute all the stock of Barq-Portsmouth which was the controlled corporation; and there were no

"securities" of this controlled corporation which had been issued by it.

Respondent on brief contended that the transactions involved do not qualify under section 355, for the asserted reason that: "In substance, petitioners exchanged their stock in the bottling corporation for stock in the realty corporation [and that] such 'stock swap' transaction is prohibited by respondent's Regulations under section 355." (Income Tax Regs., sec. 1.355–3(a)). A complete answer to this contention is, that the facts thus assumed by respondent respecting identities of the stocks exchanged are contrary to the facts stipulated by the parties. In our view, the substance of what was done coincides with the facts as stipulated; and hence, respondent's above contention is founded on an erroneous premise.

Based on our above conclusion that all conditions of section 355 were satisfied, and based also on our holding in the *Coady* case, we here decide the first issue in favor of the petitioners.

## II.

The second issue which respondent presented as an alternative is whether, even if the transactions involved do qualify for nonrecognition of gain under section 355 to the extent of the Portsmouth business, petitioner may nevertheless be charged with *constructive receipt* of a large part of the cash and also with *constructive receipt* of the Realty Company stock—both of which items actually were assets of the Barq-Portsmouth company whose stock was the only item received by petitioner. Respondent asserts that the cash and stock, alleged to have been constructively received by petitioner, constituted taxable "boot" under section 356(a).

The respondent's position as to this issue appears to be that, since petitioner and Tuttle had initially contemplated in certain of their preliminary conferences, that both cash and the Realty Company stock would be distributed to petitioner as an individual, their revised plan under which cash and the Realty Company stock were transferred instead to Barq-Portsmouth, was a sham prompted by tax avoidance motives which should be disregarded.

We think there is no merit to this alternative contention of the respondent. Petitioner and Tuttle were entitled to finally cast their transactions in whatever form was most advantageous to them. See *Arthur J. Kobacker*, 37 T.C. 882, 893, and cases therein cited. And, even if it be assumed that saving taxes was one of the factors which prompted the revision of their original plan, that alone would not justify our disregarding what was actually done by the parties, unless there were more persuasive evidence of the existence of a sham than that which we here find.

In the instant case, there can be no question that all the cash together with all the Realty Company stock were actually owned and held by Barq-Portsmouth; and we find no warrant in the present record for disregrading the separate entity of that subsisting and actively operated corporation. It follows therefore, that petitioner may not be charged with the *constructive* receipt of properties which were in fact owned and held in solution by that corporation, and which were never distributed to or received by him. If the corporation at some future time distributes such properties to petitioner, that will be an appropriate time to consider whether the value of the same should be included in his income. But we find no justification whatever for charging him with constructive receipt of any of the corporation's assets in the taxable year here involved.

We decide this second issue also in favor of the petitioners.

*Decision will be entered under Rule 50.*