\*SIDNEY L. OLSON AND MIRIAM K. OLSON, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1713–65—1716–65, 3328–65.  Filed September 21, 1967.

---

\*See Supplemental Opinion, 49 T.C. 84.

[1] Cases of the following petitioners are consolidated herewith : Philip I. Olson and Audrey B. Olson, docket No. 1714–65 ; Albert L. Schultz and Janet A. Schultz, docket No. 1715–65 ; Irving J. Olson and Ruth B. Olson, docket No. 1716–65 ; and Sidal Corp., docket No. 3328–65.

*James C. Herndon* and *Sam D. Bartlo*, for the petitioners.
*Buckley D. Sowards*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined deficiencies in the income tax of the petitioners for 1961 as follows:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Sidney L. Olson and Miriam K. Olson_____ | 1713-65 | $105,947.85 |
| Philip I. Olson and Audrey B. Olson_____ | 1714-65 | 66,291.31 |
| Albert L. Schultz and Janet A. Schultz_____ | 1715-65 | 104,590.56 |
| Irving J. Olson and Ruth B. Olson_____ | 1716-65 | 74,566.69 |
| Sidal Corp._____ | 3328-65 | 26,633.06 |

Issues presented for determination are (1) whether the distribution by Olson Electronics of Cleveland, Inc., to its shareholders of all of the stock of its wholly owned subsidiary, Olson Electronics of Buffalo, Inc., qualified as a nontaxable transaction under the provisions of section 355 of the Internal Revenue Code of 1954 or whether it constituted a taxable dividend under sections 316 and 301 of the Code, (2) what was the fair market value of Olson Electronics of Buffalo, Inc., stock on February 23, 1961, and (3) whether Sidal Corp. and the shareholders of Sidal Corp. received a dividend as the result of the distribution by Olson Electronics of Cleveland, Inc., to the shareholders of Sidal of the portion of the stock in Olson Electronics of Buffalo, Inc., which Sidal was entitled to receive.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The following individual petitioners are husband and wife, residents of the indicated cities, and filed their joint Federal income tax returns for 1961, prepared on the cash basis of accounting, with the district director in Cleveland, Ohio:

| *Husband and wife* | *Residents of—* |
|---|---|
| Sidney L. Olson and Miriam K. Olson_____ | Akron, Ohio |
| Philip I. Olson and Audrey B. Olson_____ | Cleveland, Ohio |
| Albert L. Schultz and Janet A. Schultz_____ | Akron, Ohio |
| Irving J. Olson and Ruth B. Olson_____ | Akron, Ohio |

Petitioner, Sidal Corp., sometimes hereinafter referred to as Sidal, was formed under the laws of Ohio during January 1956 and has its main office and place of business in Akron, Ohio. Sidal owned various parcels of commercial real estate for rental income. It filed its Federal corporation income tax return for 1961, prepared on the accrual basis of accounting, with the district director in Cleveland, Ohio.

Sidney, Philip, and Irving Olson are brothers.

In the early 1930's Irving founded the Olson Co. which began operations in Akron, Ohio. Soon thereafter Sidney and Philip acquired interests in the company. In 1944 or 1945 Philip withdrew from the Olson Co. and either his brothers, Irving and Sidney, or Olson Co. acquired his interest therein. In 1946 and for a number of years prior thereto Albert L. Schultz, a certified public accountant, performed accounting services for Olson Co. and in 1946 acquired an interest therein. Neither Schultz nor his wife is related, directly or indirectly, to the Olson family.

During November 1947, Olson Radio Warehouse of Cleveland, Inc., was formed under the laws of the State of Ohio and began business under that name. The name of the corporation was subsequently amended and changed during August 1959 to Olson Radio Corp. of Cleveland, Inc., which thereafter during January 1961 was changed to Olson Electronics of Cleveland, Inc., and sometimes hereinafter referred to as Cleveland. Cleveland had four original shareholders holding equal shares of the issued and outstanding stock of Cleveland, as follows:

|  | Shares |
|---|---|
| Sidney L. Olson | 25 |
| Albert L. Schultz | 25 |
| Irving J. Olson | 25 |
| Philip I. Olson | 25 |
| Total | 100 |

Cleveland caused Olson Radio Warehouse of Buffalo, Inc., to be incorporated on July 29, 1955, under the laws of the State of New York, as a wholly owned subsidiary to engage in the operation of a retail electronics store at Buffalo, N.Y. During August 1959, the corporate name was changed to Olson Radio Corp. of Buffalo, Inc., and during January 1961 was changed to Olson Electronics of Buffalo, Inc., sometimes hereinafter referred to as Buffalo. Buffalo issued 40 shares of its no-par-value common capital stock, having a stated value of $1,000 per share, to Cleveland for a total paid-in capital of $40,000. At all times material herein, these shares constituted the total issued and outstanding capital stock of Buffalo, having an adjusted cost of $40,000.

From the respective dates of their formation to and including the present, and with respect to all times herein material, Cleveland and Buffalo operated separate retail electronics stores in Cleveland, Ohio, and Buffalo, N.Y., respectively.

Upon the formation of Sidal Corp. in January 1956 its stock was issued as follows: Albert L. Schultz, 10 shares, and Sidney L. Olson, 10 shares. During December 1956, Schultz and Sidney Olson each contributed to Sidal Corp. 15 shares of the capital stock owned by them in Cleveland in exchange for the issuance by Sidal to each of them of

an additional 40 shares of its stock. Thereafter, the stockholdings in Sidal were as follows: Albert L. Schultz, 50 shares, and Sidney L. Olson, 50 shares.

The following is a statement of the operating Olson companies, sometimes hereinafter referred to as the Olson Group, in existence on February 23, 1961:

| Operating companies | Incorporated |
|---|---|
| Olson Electronics, Inc. (Akron)[1] | July 5, 1946 |
| Ohio Radio Mfg. Co. | Jan. 2, 1959 |
| Akrad Associates (partnership formed in 1947) | |
| Olson Electronics of Cleveland, Inc.[1] | Nov. 1, 1947 |
| Olson Electronics of Chicago, Inc.[1] | Feb. 26, 1951 |
| American Electronic Parts Corp. | Jan. 20, 1951 |
| Olson Electronics of Pittsburgh, Inc.[1] | Sept. 10, 1954 |
| Olson Electronics of Milwaukee, Inc.[1] | Mar. 10, 1955 |
| Olson Electronics of Buffalo, Inc.[1] | July 29, 1955 |
| Wilson & Wagner Advertising Agency, Inc. | June 19, 1952 |
| Olson Electronics, Western, Inc.[1] | Aug. 3, 1959 |
| Olson Electronics of Inglewood, Inc.[1] | Jan. 4, 1960 |
| Olson Electronics of Columbus, Inc.[1] | Feb. 1, 1960 |

[1] Operated retail electronics stores.

Olson Electronics of Cleveland, Inc., of which Philip Olson was president, a shareholder, and a member of the board of directors, owned all of the stock of Olson Electronics of Buffalo, Inc., the officers of which were as follows: Philip I. Olson, president; Sidney L. Olson, vice president; Irving J. Olson, secretary; and Albert L. Schultz, treasurer; and all of whom were members of the board of directors of the latter corporation. Irving Olson, Sidney Olson, and Albert Schultz were officer-shareholders and members of the boards of directors of all the other operating companies, except Wilson & Wagner Advertising Agency, Inc., all the stock of which was owned by Akrad Associates.

Akrad Associates was a partnership composed of Albert Schultz, Sidney Olson, and Irving Olson. The partnership utilized the services of a group of specialized personnel which provided, among others, management services, advertising and sales promotion services, and real estate management and operation services for the Olson Group.

Under the operating and personnel policies established for the Olson Group, each of the corporations operating retail stores was under the direct management of a resident manager who had management of the store within the framework of the policies established for the group. Each of the retail stores also had a supervisor, who supervised the store manager and advised him with respect to merchandise policies and operations.

Olson Electronics, Inc. (Akron), did most of the purchasing for the Olson Group, operated a central warehouse, and operated a mail-order division. In addition, Wilson & Wagner Advertising Agency, Inc., prepared advertising in common for the retail stores.

On September 4, 1957, Olson Electronics of Buffalo, Inc., entered into an agreement with Akrad Associates, terminable by either party upon 30 days' written notice, whereby Akrad agreed to furnish its management services, its advertising and sales promotion services, and its assistance in the reduction of overhead and other operating costs to Buffalo for $800 per month plus a percentage of the net profit (as defined in the agreement) as follows:

| Net profit | Akrad additional fee percentages |
|---|---|
| 0–$10,000 | 10 thereof |
| next $10,000 | 20 thereof |
| next $20,000 | 30 thereof |
| all over $40,000 | 40 thereof |

The operating and personnel policies established for the Olson Group had been designed to promote a smooth, harmonious, and profitable operation of the business of the members of the group and had demonstrated their effectiveness for that purpose. However, Philip Olson, who was president and supervisor of Olson Electronics of Cleveland, Inc., and Olson Electronics of Buffalo, Inc., caused various departures from such policies to be made at the retail store in Cleveland and that at Buffalo.

Such departures created frequent conflicts among personnel of the Olson Group having managerial and supervisory responsibilities. Although Philip had considerable ability as a merchandiser, he was lacking in ability as an administrator and supervisor in handling matters involving operating and personnel policies. As a result, during the early months of 1960, there were repercussions at the Akron store resulting from labor and personnel problems which had developed at the Buffalo store. In addition there were union-organizing activities at the Cleveland store by the Retail Store Employees Union Local 880, AFL–CIO, sometimes hereinafter referred to as the union. The personnel difficulties at Cleveland finally resulted in a petition being filed by the union with the National Labor Relations Board for an election to determine whether the employees of Cleveland desired that the union act as collective-bargaining agent for them.

The employees of Buffalo were aware that Buffalo was a subsidiary of Cleveland and they were in frequent contact with the employees of Cleveland in connection with Buffalo's procurement of merchandise from Cleveland. The Akron management considered the labor difficulties being experienced at Cleveland to be a serious situation. No

labor difficulties were being experienced by the Olson Group at any locations other than Cleveland and Buffalo.

Officials of the Olson Group were of the opinion that if the employees of Buffalo should become unionized or be included in the bargaining unit with the Cleveland personnel, this might start a spread of unionizing activities to the other stores operated by the group. That possibility was of particular concern to Schultz, who was the executive vice president of Akron and an officer and director of Cleveland, Buffalo, and the other companies in the commonly held group operating retail stores. Since Cleveland and Buffalo were the only stores in the group occupying a parent-subsidiary relationship, he felt that all possible should be done to minimize the chances of Buffalo, or any other store, becoming unionized. Consequently it was decided to attempt to limit the union activity to the Cleveland store in order to avoid an increase in the operating problems of the group and a possible reduction of profitableness of the other stores.

Morton D. Barrisch, an attorney specializing in labor relations law, was employed for Cleveland. Thereupon he was informed fully as to the situation in which Cleveland was involved, as to the concern of the officials of the Olson Group that union-organizing activities might spread to the other stores of the group in the event the union should be successful in its efforts at Cleveland, and as to the desire of the officials of the group not only to keep the union out of Cleveland but also keep it out of all of the other stores of the group.

Preparatory to the employee-representation election which was set for February 20, 1960, and in order (1) to be positive that no basis would exist for the union claiming, in the event it should win the election at Cleveland, the right to represent the employees of Buffalo or other stores in the Olson Group and (2) to ascertain definitely which employees of Cleveland were entitled to vote at the election as a part of the employee unit, Barrisch drafted an instrument, dated February 12, 1960, designated "Agreement on Voting Eligibility," which specified the individual employees of Cleveland eligible to vote at the election. The agreement was signed by representatives of the union and by Barrisch for Cleveland.

At the time he was preparing for the employee-representation election set for February 20, 1960, Barrisch was aware of the fact that the Olson Group had a number of stores, the employees of which were unorganized. Accordingly he sought to contain the election as far as possible to the single Cleveland store and keep from the obvious attention of the union the fact that there were other stores in the group whose employees were unorganized.

Barrisch also was aware that Buffalo was a wholly owned subsidiary of Cleveland and that in the event the union should win the forth-

coming election at Cleveland, it might consider the two corporations as a single employer unit and claim representation of the employees of Buffalo as well as of Cleveland. On the other hand, he was aware that in the event the union should lose the election at Cleveland, the union, within a year's time, might attempt to organize the employees of the Buffalo store. In view of the foregoing, Barrisch, prior to the forthcoming election, recommended that Buffalo be separated from Cleveland as soon as legally possible. Since such a separation during the pendency of the representation proceedings might be considered an unfair labor practice by Cleveland, Barrisch suggested that any separation of Buffalo as a subsidiary of Cleveland be done in the event the union lost the election and the representation proceedings terminated.

An election under the jurisdiction of and supervised by the National Labor Relations Board was held at the Cleveland store on February 20, 1960. That was invalidated for an undisclosed reason and a rerun or second election was held on April 14, 1960. Cleveland, the employer company, won the election, and the union was not certified by the National Labor Relations Board as bargaining agent. In view of its loss of the election held at the Cleveland store, the union threatened to file another petition with the National Labor Relations Board for another representation election at the expiration of 12 months, the minimum statutory period required for filing such petition.

About June 1960, Philip Olson ceased to be supervisor of the Buffalo store.

Early in 1961 the directors of Cleveland decided to separate Buffalo as a subsidiary of Cleveland for the purpose (1) of containing the difficulties being experienced with the employees of Cleveland and to avoid to the extent possible a spread of the organizing attempt of the union to Buffalo and possibly other stores in the Olson Group, (2) of eliminating previously existing conflicts in managerial and supervisory responsibilities, and (3) of insulating Buffalo from any involvement in or liability for a possible obligation under a guarantee by Cleveland of a lease on the premises to be occupied by a contemplated new store in the Cleveland area. At the time of their decision to separate Buffalo as a subsidiary of Cleveland, the directors of Cleveland were considering the establishment of a stock purchase plan for employees of the various corporations comprising the Olson Group. Later it was decided that, instead of instituting a stock purchase plan, greater emphasis should be and was placed on an employee profit-sharing trust which had been instituted in 1955. In March 1961, a new store, Olson Electronics Southland, Inc., was opened in the Cleveland area. Cleveland was required to guarantee the lease on the premises occupied by that store.

On February 23, 1961, the stock of Sidal Corp. was owned as follows: Sidney L. Olson, 50 shares, and Albert L. Schultz, 50 shares. On the foregoing date the officers and directors of Sidal were as follows: Sidney L. Olson, president, secretary, and director; Albert L. Schultz, vice president, treasurer, and director.

By reason of their ownership of all of the stock of Sidal Corp. and as officers of that corporation, Sidney L. Olson and Albert L. Schultz were in complete control of the corporation and the conduct of its operations and affairs.

At a meeting of the board of directors of Cleveland held on February 23, 1961, corporate action was formalized to make a distribution of the stock in Buffalo (40 shares) held by Cleveland to the shareholders of Cleveland. At that time the shareholders in Cleveland and the number of shares held by each were as follows:

|  | Number of shares held |
|---|---|
| Albert L. Schultz | 10 |
| Sidney L. Olson | 10 |
| Irving J. Olson | 25 |
| Philip I. Olson | 25 |
| Sidal Corp | 30 |
| Total | 100 |

Subsequently, Cleveland, on February 23, 1961, distributed certificates for the 40 shares of stock it held in Buffalo as follows:

|  | Number of shares |
|---|---|
| Albert L. Schultz | 10 |
| Sidney L. Olson | 10 |
| Irving J. Olson | 10 |
| Philip I. Olson | 10 |
| Total | 40 |

A distribution of Buffalo stock based on ownership of stock in Cleveland would have been as follows:

|  | Number of shares |
|---|---|
| Albert L. Schultz | 4 |
| Sidney L. Olson | 4 |
| Irving J. Olson | 10 |
| Philip I. Olson | 10 |
| Sidal Corp | 12 |
| Total | 40 |

Subsequent to the foregoing distribution both Cleveland and Buffalo continued in the active conduct of their respective businesses and the employees of Buffalo were informed that Cleveland no longer owned the stock of Buffalo.

Subsequent to the distribution of the stock in Buffalo and on February 27, 1961, Albert Schultz, due to his high income bracket for income tax purposes, decided to and did transfer the 10 shares of stock in Buffalo, which he had received, to a term trust in favor of his wife, Janet A. Schultz. The trust agreement provided, in part, as follows:

*Article III. Term of the Trust.* This Trust shall end upon the first in occurrence among the following events: (a) the day following the tenth anniverstary of the date of this trust agreement; (b) the death of my wife, Janet A. Schultz; (c) my death; and (d) the one hundred eightieth (180th) day upon which I shall have been continuously disabled from engaging in my regular occupation.

*Article IV. Obligations of the Trustee during the Trust Period.* The Trustee shall accumulate the net income in the trust estate to pay taxes payable thereon and periodically invest all or substantially all of the accumulated net income.

*Article V. Disposition of the Net Income Account.* Upon the termination of the Trust, the entire income account shall be paid and/or delivered to my wife, Janet A. Schultz or if she be deceased, to her estate.

*Article VI. Disposition of Principal Account.* Upon the termination of this Trust, the entire principal account shall be paid and/or delivered to me as Donor and, if I be deceased, to my estate or as I may have appointed by last will and testament in respect to the disposition of my residual estate.

Albert Schultz filed a gift tax return for 1961 in which he reported a per share valuation of $5,779.40 for the shares of Buffalo stock he transferred to trust.

Sidney, Irving, and Philip Olson, upon learning several weeks later that Schultz had transferred his Buffalo stock to trust, transferred the shares of stock they received in Buffalo to trusts for their respective wives containing provisions similar to the trust created by Schultz, as follows:

| Donee | Date of transfer | Beneficiary |
|---|---|---|
| Sidney L. Olson | May 29, 1961 | Miriam K. Olson |
| Irving J. Olson | May 24, 1961 | Ruth B. Olson |
| Philip I. Olson | May 24, 1961 | Audrey B. Olson |

It was the established custom of Sidney and Irving Olson and Albert Schultz at the time the various corporations in the Olson Group, particularly the corporations operating stores, were formed, to enter into a restrictive agreement relative to sale and transfer of any shareholder's interest in a particular corporation. Under date of February 24, 1961, an "Agreement of Agreed Value and Restrictive Purchase Agreement" relative to the stock of Buffalo distributed by Cleveland was executed by the four individual shareholders.

The "Agreement of Agreed Value and Restrictive Purchase Agreement," referred to above, was essentially the same relative to the terms and provisions thereof, as the restrictive agreements executed by the shareholders with respect to their stock interests in other corporations in the group made the subject of such agreements.

Incident to the part of the agreement relating to "agreed value" of the shares in Buffalo, the four individual shareholders of Cleveland receiving distribution of the shares of Buffalo agreed that for purposes of the restrictive agreement provisions, the shares in Buffalo as of February 24, 1961, had a value of $5,780 per share. The aforementioned agreed value per share for the shares of Buffalo was based on the book net worth of Buffalo at January 31, 1961. Under the provisions of the restrictive agreement, any shareholder of Buffalo could transfer any part or all of his shares by gift to or for the benefit of himself, his wife, or other members of his family, subject to the terms and provisions of the restrictive agreement. Otherwise, no stockholder could encumber or dispose of his shares in the corporation without the written consent of all stockholders, or first offering the shares for sale to the corporation. A formula for determining the purchase price was set forth in the agreement on the basis of (a) book value of the shares as of the end of the month preceding the date of sale, plus (b) an amount for goodwill equal to 1 year's earnings computed as the excess of the average annual earnings for the preceding 5 years over 10 percent of the average tangible assets for such period. Otherwise, if a certificate of "agreed value" was in existence and dated less than 1 year before the date the book value was to be determined, then the amount of the "agreed value" was conclusive. In accordance with requirements of Ohio law relative to validity of restrictive provisions in connection with the sale or transfer of shares subject to such an agreement, a notation of the restriction was placed on the stock certificates for the Buffalo shares issued.

In the income tax returns filed by each of the individual petitioners for the taxable year 1961, those petitioners reported the distribution by Cleveland of the 40 shares in Buffalo as a nontaxable distribution within the purview of section 355 of the 1954 Code. In its corporation income tax return filed for the taxable year 1961, Sidal Corp. did not report the distribution as being either taxable or nontaxable.

In determining the deficiencies in issue the respondent determined that the distribution by Olson Electronics of Cleveland, Inc., of the stock of Olson Electronics of Buffalo, Inc., was a distribution of property within the meaning of section 301(a) of the Code and that the stock had a fair market value of $15,000 a share at the time of distribution on February 23, 1961. The respondent also determined with respect to the 10 shares of Buffalo stock distributed by Cleveland to each, Albert Schultz and Sidney Olson, that a total of 12 shares constituted a constructive receipt by Sidal Corp. includable in the income of Sidal Corp. under section 316(a) of the Code and also includable to the extent of 6 shares each in the incomes of Albert Schultz and Sidney Olson.

The balance sheet of Cleveland summarized as of December 31, 1960 (the date closest to the date of distribution by Cleveland of the stock in Buffalo for which a balance sheet was available), reflected the following:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | $100,366.12 | Accounts payable | $92,882.14 |
| Receivables | 72,593.98 | Other liabilities | 102,948.37 |
| Inventory | 211,736.03 | | |
| Stock in Buffalo | 40,000.00 | Total liabilities | 195,830.51 |
| Furniture and fixtures | 12,953.11 | NET WORTH | |
| Other assets | 34,884.36 | Paid-in capital | $30,000.00 |
| | | Earned surplus | 246,703.09 |
| Total assets | 472,533.60 | | |
| | | Total net worth | 276,703.09 |
| | | Total liabilities and net worth | 472,533.60 |

At December 31, 1961, the earnings and profits of Cleveland amounted to $222,064.07.

The following is an analysis of the earned surplus account of Cleveland for the year ended December 31, 1961:

| | | |
|---|---|---|
| Beginning earned surplus Jan. 1, 1961 | | $246,703.09 |
| Taxable income 1961 | | 91,678.01 |
| Nontaxable interest | | 5,794.16 |
| Overaccrual 1960 income tax | | 45.82 |
| Total credits | | 344,221.08 |
| Distributions to stockholders: | | |
| Dividends (cash) | $40,000.00 | |
| Other property (Buffalo stock) | 40,000.00 | |
| Federal income tax | 42,157.01 | |
| Capitalization of earned surplus | 70,000.00 | |
| Total debits | | 192,157.01 |
| Ending earned surplus Dec. 31, 1961 | | 152,064.07 |

At December 31, 1961, (1) the accumulated earnings and profits of Sidal Corp. amounted to $78,648.15 without consideration being extended to the effect of any distribution, constructive or otherwise, from Cleveland to Sidal of the Buffalo shares; and (2), assuming a constructive distribution by Cleveland to Sidal of 12 shares in Buffalo, the earnings and profits of Sidal would be increased for the taxable year 1961 by an amount not in excess of $12,000.

The balance sheet of Buffalo, summarized as of January 31, 1961 (the date closest to the date of distribution by Cleveland of the shares

in Buffalo for which a balance sheet was submitted), reflected the following:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | $35,167 | Accounts payable | $17,700 |
| Receivables | 4,116 | Other liabilities | 21,753 |
| Inventory | 124,851 | Total liabilities | 39,453 |
| Furniture and fixtures | 11,422 | | |
| Other assets | 124,492 | NET WORTH | |
| Total assets | 300,048 | Paid-in capital | $4,000 |
| | | Profit, period to date | 67,152 |
| | | Earned surplus | 189,443 |
| | | Total net worth | 260,595 |
| | | Total liabilities and net worth | 300,048 |

The following is a statement of the net earnings, dividends paid, and yearend accumulated earnings of Buffalo for the indicated years:

| FYE June 30— | Net earnings | Dividends paid | Accumulated earnings |
|---|---|---|---|
| 1956 | $16,194.45 | 0 | $16,194.45 |
| 1957 | 29,680.47 | 0 | 45,874.92 |
| 1958 | 34,055.59 | 0 | 79,930.51 |
| 1959 | 35,792.08 | 0 | 115,722.59 |
| 1960 | 38,123.31 | $1,000 | 152,845.90 |
| 1961 | 41,853.94 | 21,000 | 175,787.79 |

Buffalo distributed $32,000 in dividends in the year ended June 30, 1962.

The fair market value of Olson Electronics of Buffalo, Inc., stock on February 23, 1961, was $8,500 per share.

OPINION

The petitioners take the position that on the basis of the record presented the distribution on February 23, 1961, by Olson Electronics of Cleveland, Inc., of the 40 shares of the capital stock held by it in Olson Electronics of Buffalo, Inc., its wholly owned subsidiary, was a nontaxable distribution within the purview of section 355 of the Code. The respondent takes the position that the petitioners have failed to show (1) that there was a valid business purpose for the distribution and (2) that the distribution was not used principally as a device for the distribution of the earnings and profits of Cleveland or Buffalo or both and that in view of the foregoing failures, the distribution does not qualify as a nontaxable distribution but constituted a taxable dividend under sections 301 and 316 of the Code.

The record is clear that in the early part of 1960 Cleveland was

experiencing labor difficulties with at least a unionized minority portion of its employees, who upon denial by Cleveland of their request that the union be recognized as collective-bargaining agent for Cleveland's employees resorted to the National Labor Relations Board for its assistance in obtaining the desired recognition. Upon the filing of a petition by the union, the National Labor Relations Board ordered an election to determine whether the employees of Cleveland desired that the union act as collective-bargaining agent for them. An election was held on February 20, 1960, but for an undisclosed reason was invalidated. A rerun or second election was held on April 14, 1960. The result was that Cleveland won the election and the union was not certified by the National Labor Relations Board as bargaining agent. In view of the loss of the election the union threatened to file another petition with the National Labor Relations Board for a representation election at the expiration of 12 month, the minimum statutory period required for filing such petition. In the meantime Buffalo and the other retail stores of the Olson Group were faced with possible union-organizing activity. Since Cleveland, with Buffalo as its subsidiary, was the only operating store having a subsidiary, the officers of Cleveland, who also were stockholders of it and pursuant to the advice of Barrisch, decided to separate Buffalo as a subsidiary from Cleveland. From our consideration of the record we are satisfied that the primary purpose for separating Buffalo as a subsidiary from Cleveland was to contain the labor difficulties being experienced with the employees of Cleveland and to avoid to the extent possible, a spread of the organizing attempts of the union to Buffalo and other stores in the Olson Group.

The respondent contends that the efforts to contain the union organizing activity at Cleveland were not a business exigency and that the labor difficulties experienced there were not a business reason for the separation of Buffalo by the distribution of the shares thereof by Cleveland as parent corporation. In support thereof the respondent relies on, among others, *Commissioner* v. *Wilson*, 353 F. 2d 184 (C.A. 9, 1965).

It has been held that where two businessmen, who no longer are able to agree between themselves as to the proper means for advancing their common business interests, agree to separate their interests and thereafter conduct through two corporations the businesses which they theretofore conducted through the use of a single corporate entity, the purpose of the transaction is a sound and valid business purpose and that Congress, in enacting section 355, intended to provide a means whereby a separation motivated by such a purpose could be accomplished without the deterrent effect of being subjected to tax. *Albert W. Badanes*, 39 T.C. 410, 415 (1962), petition for review dismissed (C.A. 6, 1963). Cf. *Edmund P. Coady*, 33 T.C. 771 (1960), affd. 289

F. 2d 490 (C.A. 6, 1961); *W. E. Gabriel Fabrication Co.*, 42 T.C. 545 (1964).

In view of the labor difficulties with its employees theretofore experienced by Cleveland and the impending difficulties threatened by the union, the officers and stockholders of Cleveland, in order to contain such difficulties within Cleveland and to avoid to the extent possible a spread of the organizing attempt of the union to Buffalo and other unorganized stores in the Olson Group, authorized and caused to be distributed the stock of Buffalo to the stockholders of Cleveland on February 23, 1961. In so causing the distribution of the Buffalo stock, the officers and stockholders of Cleveland grounded their action on bona fide differences between Cleveland and a group of its employees and their union and not on nonexistent reasons and "afterthoughts" presented as business purposes in *Commissioner* v. *Wilson, supra.*

In the *Badanes* case, the action of the two stockholders of a corporation who, in order to avoid the development of further differences and conflicts between them as to the conduct of the business of the corporation, separated the assets of the corporation between them and thereafter each operated business through a separate corporate enterprise, was held to constitute a valid business purpose. Such being the case it likewise would appear here that Cleveland's distribution to its stockholders of its stock in Buffalo, in order to avoid to the extent possible the development of further differences and conflicts between Cleveland and its employees and a union representing them, and the development of differences and conflicts between Buffalo and its employees and a union representing them, also constituted a valid business purpose for the distribution. As a result of the distribution Cleveland no longer remained owner of the stock of Buffalo and no longer remained an intermediary between Buffalo and any third party or parties.

In support of his position that petitioners have failed to show that the distribution by Cleveland of its stock in Buffalo was not used principally as a device for the distribution of the earnings of Cleveland or Buffalo or both, the respondent points to the fact that on February 27, 1961, Albert Schultz, due to his high income bracket for income tax purposes, transferred the 10 shares of stock in Buffalo, which he had received, to a term trust in favor of his wife, Janet A. Schultz, that on May 24, 1961, Irving Olson and Philip Olson and on May 29, 1961, Sidney Olson transferred the 10 shares of stock in Buffalo which they respectively had received in the distribution to trusts for their respective wives containing provisions similar to that in the case of Albert Schultz. From the foregoing and from the further fact that prior to its fiscal year ended June 30, 1960, Buffalo did not pay any dividends and that during its fiscal years ended June 30, 1960, through June 30, 1962, it paid dividends in the respective amounts

of $1,000, $21,000, and $32,000, the respondent urges that we conclude that the distribution by Cleveland of the Buffalo stock to the four distributees and their creation of term trusts and the transfer of the stock thereto were for the purpose of shifting income from them, the distributees of the stock, to taxpayers, the trusts, in lower tax brackets, thereby avoiding as much tax as possible on dividends declared and paid by Buffalo.

Concededly under the provisions of section 355, if the distribution by Cleveland of its stock in Buffalo was used principally as a device for the distribution of the earnings and profits of Cleveland or of Buffalo or both, then the distribution fails to qualify as a nontaxable transaction within the purview of section 355.

While section 355 does not contain any specific provision relating to the transfer by the distributees of stock in a distribution of the character here involved, the section does provide in subsection (a) (1) (B):

(but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

Here, we do not have the sale or exchange by the distributees of the Buffalo stock but transfers thereof by them to term trusts which provided that upon the terminations thereof, the corpus or principal accounts of such trusts were to be paid or delivered to the respective trustors or in case of their deaths to their estates. The record shows that prior to the distribution of the Buffalo stock there had been no discussions, negotiations, or agreements by the distributees respecting what action, if any, they would take as to their respective shares. Consequently if the above-quoted provisions of section 355 could be considered as applicable to transfers to trust, we would be required to conclude that the distribution of the Buffalo stock was not used principally as a device for the distribution of the earnings and profits of Cleveland or of Buffalo or both.

Congress, in enacting section 355, saw fit to prescribe that a sale under limited conditions of stock received in a distribution of the character here involved would disqualify the distribution for recognition as a nontaxable transaction. However, Congress did not see fit to prescribe any similar disqualifying limitations as to transfers to trust of stock so received, even though such transfers to trust would result in distributees of the stock avoiding payment of as much tax as possible on dividends declared and paid on the stock. Since Congress did not see fit to do so, we are unable to do so. As was said in *Commissioner* v. *Morris Trust*, 367 F. 2d 794 (C.A. 4, 1966), affirming 42 T.C. 779 (1964):

We are thus led to the conclusion that this carefully drawn statute [sec. 355] should not be read more broadly than it was written to deny nonrecognition of gain to reorganizations of real businesses of the type which Congress clearly intended to facilitate by according to them nonrecognition of present gain.

It is well settled that a taxpayer has the legal right to so conduct his business transactions as to minimize the incidence of taxation, or altogether avoid the amount of what would otherwise be his taxes, by whatever means the law permits. *Gregory* v. *Helvering*, 293 U.S. 465, 469 (1935); *United States* v. *Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Zenz* v. *Quinlivan*, 213 F. 2d 914 (C.A. 6, 1954); *Aldon Homes, Inc.*, 33 T.C. 582 (1959). It is also settled that the taxpayer's motive to avoid taxation will not establish liability if the transaction does not do so without it. *Zenz* v. *Quinlivan, supra; United States* v. *Cumberland Pub. Serv. Co., supra.*

In view of what has been said above we conclude that the distribution by Cleveland of its stock in Buffalo was not used principally as a device for the distribution of the earnings and profits of Cleveland or Buffalo or both.

Since we have not sustained the respondent's position that the petitioners have failed to show that there was a valid business purpose for the distribution in issue and that the distribution was not used principally as a device for the distribution of earnings and profits of Cleveland or Buffalo or both, we conclude and hold that the distribution was a nontaxable transaction within the purview of section 355.

As stipulated by the parties, formal corporate action was taken by Cleveland on February 23, 1961, to make a distribution to Cleveland's shareholders of the Buffalo stock held by Cleveland. However, in the issuance by Cleveland of certificates for the Buffalo stock, no certificate was issued to Sidal Corp. for 12 shares of Buffalo stock which had been formally authorized to be distributed to Sidal. Instead, one-half of such shares were included in the stock certificate issued to Albert Schultz and one-half in the certificate issued to Sidney Olson, who were equal owners of the stock of Sidal Corp. Schultz, who was treasurer of Cleveland and responsible for the issuance of certificates for the Buffalo stock, testified that it was his practice in conversations and discussions with respect to stock and stock ownership to think and speak in terms of stock control and that consequently in preparation of certificates for the Buffalo stock he overlooked checking the stock records of Cleveland to ascertain the amount of Sidal Corp.'s stock ownership in Cleveland and to issue accordingly to Sidal a certificate for the shares of Buffalo stock to which it was entitled. He further testified that when the matter was brought to his attention some years later, steps then were taken which eventually resulted in a transfer to Sidal of 12 shares of Buffalo stock.

As we view the situation it is immaterial why a certificate for 12 shares of Buffalo stock was not issued to Sidal in the first instance. The corporate action taken by Cleveland in making a distribution of its Buffalo stock gave Sidal, as a stockholder of Cleveland, the right to receive 12 shares of Buffalo stock. Such action resulted in Sidal becoming at least the beneficial owner of that number of shares of Buffalo stock. Cf. *H. Grady Lester, Jr.*, 40 T.C. 947, 952 (1963); *Patricia W. Burke*, 42 T.C. 1021, 1025 (1964). Since the 12 shares comprised part of the distribution made by Cleveland of its Buffalo stock and since that distribution was a nontaxable transaction within the purview of section 355 of the Code, no portion of the value of the 12 shares constituted taxable income to Sidal.

By reason of the fact that Schultz and Sidney Olson were equal owners of all of the stock of Sidal and were its officers, they were in complete control of its operations and affairs. Each of them, in the distribution by Cleveland of its Buffalo stock, accepted certificates of Buffalo stock which, in part, represented one-half of the number of shares of Buffalo stock of which Sidal was the equitable owner. The shares of the Buffalo stock represented by the foregoing certificates, including the shares of which Sidal was the equitable owner, were subsequently transferred to trust by Schultz and Sidney Olson, respectively. By reason of their complete control of Sidal and of their transfers to trust of shares of Buffalo stock of which Sidal was the equitable owner, we are of the opinion that the shares of which Sidal was the equitable owner are properly to be regarded as dividends distributed by Sidal to Schultz and Sidney Olson to the extent the fair market value of such shares at the time of the distribution by Cleveland of the Buffalo stock did not exceed a total of $90,648.15.

Although the respondent in his notices of deficiency determined that the fair market value of the Buffalo stock on February 23, 1961, was $15,000 per share, he here takes the position that such value was $9,000. In support of such position he relies on the testimony of a witness produced in his own behalf who testified to a value of $9,000 per share. Although petitioners presented witnesses who expressed values for Buffalo stock on February 23, 1961, ranging from $5,500 to $7,500 per share, petitioners here take the position that such value was $5,780 per share. From a consideration of all of the evidence bearing on the question we have found as a fact that the fair market value of the Buffalo stock on February 23, 1961, was $8,500 per share.

*Decisions will be entered under Rule 50.*